COPE, J.
This is an appeal of a final judgment of adoption, under which F.G. became the adoptive father of two boys, X.X.G. and N.R.G. (collectively, “the children”). The trial court found, and all parties agree, that F.G. is a fit parent and that the adoption is in the best interest of the children.
The question in the case is whether the adoption should have been denied because F.G. is a homosexual. Under Florida law, a homosexual person is allowed to be a foster parent. F.G. has successfully served as a foster parent for the children since 2004. However, Florida law states, “No person eligible to adopt under this statute [the Florida Adoption Act] may adopt if that person is a homosexual.” § 68.042(3), Fla. Stat. (2006). According to the judgment, “Florida is the only remaining state to expressly ban all gay adoptions without exception.” Judgment at 38. Judge Cindy Lederman, after lengthy hearings, concluded that there is no rational basis for the statute. We agree and affirm the final judgment of adoption.[1],[2]
I.
We begin with three observations. First, there does not appear to be any disagreement between the parties regard *82 ing the facts of the case. The parties entered into a lengthy list of stipulated facts. The stipulated facts are attached as an appendix to this opinion. Second, the parties agree that the father is a fit parent and that the adoption is in the best interest of the children. Appendix ¶¶ 44-56. Third, the Department of Children and Families [“Department”] “agrees that gay people and heterosexuals make equally good parents.” Appendix ¶ 31.
II.
Turning now to the facts of this case, in 2004 the Department removed X.X.G., then four years old, and N.R.G., then four months old, from their home based on allegations of abandonment and neglect. The Department contacted F.G., a licensed foster caregiver, and asked him to accept the children on a temporary basis until a more permanent placement could be found.[3]
The children arrived with medical problems and other needs. X.X.G. arrived wearing a dirty adult-sized t-shirt and sneakers four sizes too small. Both children were suffering from ringworm and the four-month-old suffered from an untreated ear infection. X.X.G., the four-year-old, did not speak and his main concern was changing, feeding and caring for his baby brother.
The children thrived in F.G.’s household. “It is clear to this Court that [F.G.] is an exceptional parent to [X.X.G. and N.R.G.] who have healed in his care and are now thriving.” Final Judgment at 87.
Because of the natural parents’ neglect of the two children, the Department filed a petition for termination of the natural parents’ parental rights. In 2006, that petition was granted and the natural parents’ parental rights were terminated. X.X.G. and N.R.G. became available for adoption.
F.G. applied to adopt the children. The Center for Family and Child Enrichment, Inc. (“The Family Center”), a private nonprofit corporation, had been monitoring the two boys during foster care and was assigned the duty of evaluating F.G.’s ability to provide a satisfactory adoptive placement.[4] The Family Center reported that F.G.’s home presented a suitable environment and that he met all the criteria required to adopt the two boys. The parties stipulated that F.G. provides a safe, healthy, stable and nurturing home for the children meeting their physical, emotional, social and educational needs. The Family Center recommended against the application, though, because F.G. is a homosexual and is prohibited from adopting children under subsection 63.042(3), Florida Statutes. The Department denied the application on that basis. The Department acknowledged that it would have approved the application if it had not been for the statute.
In 2007, F.G. filed a petition in the circuit court to adopt the children. F.G. asked the court to find subsection 63.042(3) unconstitutional because it violates his rights to equal protection, privacy, and due process. Independent counsel acting on behalf of the children asserted that the children’s rights to equal protection and due process had also been violated. The Department filed a motion to dismiss, but the court only dismissed the privacy claim.
Trial began on October 1, 2008, and continued for four days. F.G. presented fact witnesses as well as expert witnesses who testified regarding homosexual and *83 heterosexual parenting capabilities. In opposition, the Department offered the testimony of two expert witnesses.
The trial court rendered a 58-page judgment declaring subsection 68.042(3) unconstitutional and granting the petition for adoption. The trial court found, among other things, that the statute violates the equal protection rights of F.G. and the children that are guaranteed by Article I, Section 2 of the Florida Constitution.
The Department has appealed.
III.
The Department contends that the trial court erred by finding subsection 63.042(3) unconstitutional. The Department argues that there is a rational basis for the statute and that the trial court misinterpreted the law.
Under the Florida Constitution, each individual person has a right to equal protection of the laws. The constitutional provision states, in part:
SECTION 2. Basic rights. — All natural persons, female and male alike, are equal before the law and have inalienable rights, among which are the right to enjoy and defend life and liberty, to pursue happiness, to be rewarded for industry, and to acquire, possess and protect property....
Art. I, § 2, Fla. Const.
F.G. successfully argued in the trial court that the statute treated him unequally in violation of the constitutional provision because the statute creates an absolute prohibition on adoption by homosexual persons, while allowing all other persons— including those with criminal histories or histories of substance abuse — to be considered on a case-by-case basis.
When this case was pending in the trial court, the parties and trial court agreed that this case does not involve a fundamental right or suspect class, so the case was decided under the rational basis test. That being so, we have considered this appeal only under that test.[5]
Under the rational basis test, “a court must uphold a statute if the classification bears a rational relationship to a legitimate governmental objective.” Warren v. State Farm Mut. Auto. Ins. Co., 899 So.2d 1090, 1095 (Fla.2005). The classification must be “based on a real difference which is reasonably related to the subject and purpose of the regulation.” State v. Leicht, 402 So.2d 1153, 1155 (Fla.1981) (emphasis added).
The question now before us — whether there is a rational basis for subsection 63.042(3) — was previously presented to the Supreme Court of Florida with inconclusive results. A constitutional challenge was brought in Cox v. Florida Department of Health & Rehabilitative Services, 656 So.2d 902 (Fla.1995), where the Second District Court of Appeal held the statute to be constitutional. Our Supreme Court upheld the Second District’s ruling, except with regard to the equal protection issue— the issue before us now.
With regard to the equal protection issue, the Cox Court noted that the parties had waived an evidentiary hearing in the trial court and allowed “the case to proceed to resolution with the parties simply submitting briefs and their own packets of *84 research materials to the trial court.” 656 So.2d at 903. The Supreme Court said:
The record is insufficient to determine that this statute can be sustained against an attack as to its constitutional validity on the rational-basis standard for equal protection under article I, section 2 of the Florida Constitution. A more complete record is necessary in order to determine this issue. Upon remand, the proceeding is limited to a factual completion of the record as to this single constitutional issue and a decision as to this issue based upon the completed record.
Id. After the case was returned to the trial court, Cox abandoned the petition and the equal protection issue was never addressed. In light of the Cox decision, the trial court conducted an extensive eviden-tiary hearing in this case.[6]
IV.
We next consider how the adoption statute works. The statute requires that there be individual studies which the judge must consider in order to decide whether the proposed adoption is in the best interest of the child. § 63.022(2), (4)(c), Fla. Stat.; Fla. Admin. Code R. 56C-16.005(2).
There must be a favorable preliminary home study, § 63.112(2)(b), Fla. Stat., followed by a final home investigation “to ascertain whether the adoptive home is a suitable home for the minor and whether the proposed adoption is in the best interest of the minor.” Id. § 63.125(1); Fla. Admin. Code R. 65C-16.001(7), (8). “The report of the investigation must contain an evaluation of the placement with a recommendation on the granting of the petition for adoption and any other information the court requires regarding the petitioner or the minor.” § 63.125(3), Fla. Stat. This process includes a family social and medical history, in-home visits with the minor and minor’s proposed adoptive parent or parents and gathering any other information which may be relevant to the suitability of the intended adoptive home. Id. § 63.125(5). If the trial judge concludes that the adoption is in the best interest of the person to be adopted, the Court enters the judgment of adoption. Id. § 63.142(4).[7]
Simply put, the statute calls for an individual, case-by-case evaluation to determine if the proposed adoption is in the best interest of the child. Except for homosexual persons, there is no automatic, categorical exclusion of anyone from consideration for adoption.
For example, “[ajdoption applicants who have previous verified findings of abuse, neglect or abandonment of a child are subject to a special review before they can be approved to adopt, but are not automatically disqualified from adopting.” Appendix ¶ 15. For a child who was privately placed (not placed by the Department or Department’s agent), there is no categorical exclusion for adoption by a person with a prior criminal history, although a special review is involved. Appendix ¶¶ 12-15. Where the placement is through the Department, a very serious criminal history is disqualifying. Appendix ¶ 12. There is a five-year preclusion if there is a prior history for assault, battery, or a drug crime, Appendix ¶ 13, and no preclusion for other felonies.
*85 Florida law specifies that a person cannot be “prohibited from adopting solely because such person possesses a physical disability or handicap, unless it is determined by the court or adoption entity that such disability or handicap renders such person incapable of serving as an effective parent.” § 63.042(4), Fla. Stat. An individual who is HIV-positive but healthy and able to care for a child is not excluded if, after having a physical, a doctor determines that the applicant is healthy and that the child is not going to go through another loss. Appendix ¶ 11. There is a special review, but no categorical exclusion, for an applicant “with serious or chronic medical conditions that could predictably compromise ... the ability to provide the physical, emotional, social and economic support necessary for a child to thrive.” Appendix ¶ 10. “No person shall be denied the opportunity to become an adoptive parent on the basis of race, color or national origin.” Fla. Admin. Code R. 650-16.005(1).
A single adult is specifically allowed to adopt. § 63.042(2)(b), Fla. Stat. Florida “makes over a third of its adoptive placements with single adults.” Appendix ¶ 2. “The percentage of adoptions of dependent children in Florida that were by single parents for the year 2006 was 34.47 Appendix ¶ 2.
The Department or its agents “have placed children in the permanent care of foster parents known by [the Department] and/or its agents to be lesbians or gay men.” Appendix ¶ 26. Homosexual persons “are not prohibited by any state law or regulation from being legal guardians of children in Florida.” Appendix ¶ 27. The Department or its agents have placed children in the care, including permanent care, of legal guardians known by the Department and/or its agents to be lesbians or gay men, and ceased Department supervision. Appendix ¶¶ 28-29.
However, the Florida Adoption Act categorically excludes a homosexual person from adopting. The question is whether there is a rational basis for the difference in treatment.
V.
Given a total ban on adoption by homosexual persons, one might expect that this reflected a legislative judgment that homosexual persons are, as a group, unfit to be parents.
No one in this case has made, or even hinted at, any such argument. To the contrary, the parties agree “that gay people and heterosexuals make equally good parents.” Appendix ¶ 31. “The qualities that make a particular applicant the optimal match for a particular child could exist in a heterosexual or gay person.” Appendix ¶ 32.[8] Thus in this case no one attempts to justify the prohibition on homosexual adoption on any theory that homosexual persons are unfit to be parents.
Instead, the Department argues that there is a rational basis for the prohibition on homosexual adoption because children will have better role models, and face less discrimination, if they are placed in non-homosexual households, preferably with a husband and wife as the parents. But that is not what the statute does.
*86 As previously stated, the statute specifically allows adoption by an unmarried adult. § 63.042(2)(b). Single parent adoption has been allowed under the Florida Adoption Act, enacted in 1973, and predecessor statutes. § 63.042(2)(b), Fla. Stat. (1973); ch. 73-159, § 4, Laws of Fla.; § 63.061, Fla. Stat. (1967); ■§ 72.11, Fla. Stat. (1943). One-third of Florida’s adoptions are by single adults. Appendix ¶ 2. The Florida Statutes do not restrict adoption to heterosexual married couples.
The statute contains no prohibition on placing children with homosexual persons who are foster parents. The Department has placed children with homosexual foster parents in short-term placements, and long-term placements. Appendix ¶¶ 25-26. The average length of stay in foster care before adoption is thirty months. Appendix ¶ 38.
Florida also has a guardianship statute. Ch. 744, Fla. Stat. Homosexual persons “are not prohibited by any state law or regulation from being legal guardians of children in Florida.” Appendix ¶ 27. The Department has placed children in the legal guardianship of homosexual persons. This has included permanent guardian-ships in which the Department ceased supervision. Appendix ¶ 29.
It is difficult to see any rational basis in utilizing homosexual persons as foster parents or guardians on a temporary or permanent basis, while imposing a blanket prohibition on adoption by those same persons.[9] The Department contends, however, that the basis for this distinction can be found in the social science evidence.
VI.
The trial court heard extensive expert testimony in this case. F.G. presented Dr. Letitia Peplau, Professor of Psychology at the University of California in Los Ange-les; Dr. Susan Cochran, Professor of Epidemiology and Statistics at the University of California in Los Angeles; and Dr. Michael Lamb, Professor of Psychology at the University of Cambridge, London, England, and former research scientist at the National Institute of Child Health and Human Development (part of the National Institute of Health). F.G. also presented Dr. Margaret Fischl, Professor of Medicine at the University of Miami School of Medicine; Dr. Frederick Berlin, Associate Professor at Johns Hopkins University School of Medicine in Baltimore, Maryland; Dr. David M. Brodzinsky, Professor Emeritus, Developmental and Clinical Psychology, Rutgers University; Patricia Lager, Professor of Social Work at Florida State University in Tallahassee, Florida; Christine Thorne, the Department’s Quality Assurance Manager; Aida Gonzalez, the Department’s Licensing Foster Care Specialist; and Gay Frizzell, Chief of Child Welfare Services and Training in the Family Safety Program Office.
The Department offered Dr. George A. Rekers, Distinguished Professor of Neu-ropsychiatry and Behavioral Science Emeritus, University of South Carolina School of Medicine; and Dr. Walter Schumm, Associate Professor of Family Studies, Kansas State University.
The court concluded as follows:
The quality and breadth of research available, as well as the results of the studies performed about gay parenting and children of gay parents, is robust and has provided the basis for a eonsen- *87 sus in the field. Many well renowned, regarded and respected professionals have [produced] methodologically sound longitudinal and cross-sectional studies into hundreds of reports. Some of the longitudinal studies have tracked children for six, ten and fourteen years. The starting ages of the children in the longitudinal studies has varied from birth, six to ten years old and followed them throughout childhood, adolescence and into adulthood. The studies and reports are published in many well respected peer reviewed journals including the Journal of Child Development, the Journal of Family Psychology, the Journal of Child Psychology, and the Journal of Child Psychiatry. Each of the studies and hundreds of reports also withstood the rigorous peer review process and were tested statistically, rationally and methodologically by seasoned professionals prior to publication.
In addition to the volume, the body of research is broad; comparing children raised by lesbian couples to children raised by married heterosexual couples; children raised by lesbian parents from birth to children raised by heterosexual married couples from birth; children raised by single homosexuals to children raised by single heterosexuals; and children adopted by homosexual parents to those raised by homosexual biological parents, to name a few. These reports and studies find that there are no differences in the parenting of homosexuals or the adjustment of their children. These conclusions have been accepted, adopted and ratified by the American Psychological Association, the American Psychiatry Association, the American Pediatric Association, the American Academy of Pediatrics, the Child Welfare League of America and the National Association of Social Workers. As a result, based on the robust nature of the evidence available in the field, this Court is satisfied that the issue is so far beyond dispute that it would be irrational to hold otherwise; the best interests of children are not preserved by prohibiting homosexual adoption.
Final Judgment at 36-37 (emphasis added). This finding coincides with the Department’s agreement “that gay people and heterosexuals make equally good parents.” Appendix ¶ 31.[10]
As we understand it, the Department maintains that the trial court should not have conducted an evidentiary hearing. We reject that argument. In the Cox decision, which considered the identical constitutional challenge, the Florida Supreme Court ruled that an evidentiary hearing must be held. 656 So.2d at 903.
The Department also appears to say that the trial court should not have made findings about the social science evidence. Again, we disagree. The Cox decision called for “a factual completion of the record as to this single constitutional issue and a decision as to this issue based upon the completed record.” Id.
The Department does not argue that the trial court’s judgment lacks support in the evidence.
VII.
Turning now to the remainder of the Department’s argument, we understand the Department to assert that if there is an alternative legitimate way to interpret the scientific data, then that alternative *88 view can provide a rational basis for the statute’s blanket exclusion of homosexual adoption while allowing homosexual foster case and guardianships. The Department contends that the alternative views expressed by its experts and F.G.’s experts support the existence of a rational basis for the statute. See Hamilton v. State, 366 So.2d 8, 10 (Fla.1978) (classification will be upheld where there continues to be expert opinion supporting the reasons which prompted the legislature to enact the statute).
We consider first the Department’s experts. One of the Department’s witnesses was Dr. Schumm. Dr. Schumm is of no assistance to the Department’s argument. That is so because Dr. Schumm did not agree “that homosexuals should be banned from adopting but rather states that gay parents can be good foster parents, and opines that the decision to permit homosexuals to adopt is best made by the judiciary on a case by case basis.” Final Judgment at 24.
The final judgment also states:
Although Dr. Schumm is not a psychologist, a summary of his testimony is included in this section because he conducted a methodological analysis of the works of psychologists on homosexual parenting. When reanalyzing studies on outcomes of children raised by gay parents, he found some differences in outcomes as a factor of parental sexual orientation where the original researchers reported no differences (the null hypothesis). He suggests that his reanalysis, mostly unpublished, should be accepted over the analyses of well respected researchers in peer reviewed journals. Dr. Schumm admitted that he applies statistical standards that depart from conventions in the field. In fact, Dr. Cochran and Dr. Lamb testified that Dr. Schumm’s statistical reanalysis contained a number of fundamental errors. Dr. Schumm ultimately concluded that based on his re-analysis of the data, there are statistically significant differences between children of gay and lesbian parents as compared to children of heterosexual parents. Dr. Schumm understands that much of the scientific community disagrees with his conclusions and concedes to the possibility that some gay parents may be beneficial to some children.
Final Judgment at 23-24.
The testimony of Dr. Schumm does not support the blanket prohibition on homosexual adoption. Dr. Schumm’s conclusion was that such decisions should be made on a case-by-case basis. Further, the trial court was entitled to accept the testimony of Dr. Cochran and Dr. Lamb that Dr. Schumm’s statistical re-analyses contained fundamental statistical errors.
The Department also called Dr. Rekers to testify as an expert. Dr. Rekers opined that “homosexuals are less able to provide a stable home for children than heterosexuals.” Final Judgment at 19. He cited several studies indicating that homosexual adults have a higher lifetime prevalence of major depression, affective disorders, anxiety disorders and substance abuse. For that reason, Dr. Rekers believes that adoption (and foster parenting) should be ruled out for homosexual persons.[11]
Unlike Dr. Schumm, Dr. Rekers sees no role for individual evaluation of the pro *89 posed adoptive parent, if that parent is a homosexual. He maintained that performing an individualized study of the proposed adoptive parent, like F.G., is not viable because even if F.G. is found to be entirely appropriate as an adoptive parent at the present time, it is possible that he may develop some sort of a disorder later in life.[12]
By contrast, Dr. Cochran, one of F.G.’s witnesses, testified that the scientific data do not support Dr. Rekers’ analysis:
As a general premise, elevated occurrences of psychiatric disorders and rates of depression and suicidality are associated with demographic characteristics, such as race, gender, age, socioeconomic status and sexual orientation. In terms of the specific demographic characteristic of sexual orientation, the witness [Dr. Cochran] cited to several population-based studies comparing the mental health of gay and heterosexual individuals including the 1996 National Survey on Drug Abuse, the National Co-morbidity Survey (1990-1992), the National Health and Nutrition Examination Survey (1971-1975, 1976-1980, 1988-1994, 1999-2002, 2003-2004, 2005-2006), the National Examination Survey, the Midlife Survey of Adult Development (1995-1996), the Add Health Cohort study (1994-95, 1996, 2001-2002, 2007-2008), the California Quality of Life Survey (2001) and the National Latino and Asian-American Survey (May 2002 and November 2003). According to the witness [Dr. Cochran], taken as a whole, the research shows that sexual orientation alone is not a proxy for psychiatric disorders, mental health conditions, substance abuse or smoking; members of every demographic group suffer from these conditions at rates not significantly higher than for homosexuals. Therefore, based on the research, while the average rates of psychiatric conditions, substance abuse and smoking are generally slightly higher for homosexuals than heterosexuals, the rates of psychiatric conditions, substance abuse and smoking are also higher for American-Indians as compared to other races, the unemployed as compared to the employed and non-high school graduates as compared to high school graduates, for example. Poignantly, Dr. Cochran pointed out that if every demographic group with elevated rates of psychiatric disorders, substance abuse and smoking were excluded from adopting, the only group eligible to adopt under this rationale would be Asian American men.
Final Judgment at 13-14 (emphasis added) (footnote omitted). Dr. Cochran also testified about errors in scientific methodology and reporting in Dr. Rekers’ study, stating that Dr. Rekers had failed to present an objective review of the evidence on those subjects. R. 916-18. Dr. Cochran concluded that Dr. Rekers’ work did not meet established standards in the field. R. 916-18. Another expert, Dr. Peplau, testified that Dr. Rekers had omitted in his review of the scientific literature “other published, widely cited studies on the stability of actual relationships over time.” R. 822.
Dr. Rekers was questioned about his recent authorship of a law review article entitled An Empirically Supported Rational Basis for Prohibiting Adoption, Foster Parenting, and Contested Child Custody by Any Person in a Household *90 that Includes a Homosexually-Behaving Member, 18 St. Thomas L. Rev. 325 (2005). According to the judgment, “the doctor heavily cited to the conclusions of a colleague who is sharply criticized as distorting data and was censured and ousted [or withdrew in lieu of ousting] by the American Psychological Association for misreporting evidence regarding homosexual households.” Final Judgment at 20 (footnote omitted). The court concluded that “Dr. Rekers’ testimony was far from a neutral and unbiased recitation of the relevant scientific evidence.” Final Judgment at 23.
Under applicable law, a legislative classification will be upheld if it is “based on a real difference which is reasonably related to the subject and purpose of the regulation.” Leicht, 402 So.2d at 1155. The trial judge was entitled to reach the conclusion, which she did, that the Department’s experts’ opinions were not valid from a scientific point of view.
VIII.
The Department argues that homosexuals should be barred from adopting “because the homes of homosexuals may be less stable and more prone to domestic violence.” Initial Brief at 34. The Department maintains that in this part of its argument, it is relying on F.G.’s own experts. The Department has, however, read selectively from the expert testimony and the record does not support the Department’s position.
The Department says that there are disturbingly high domestic violence rates among same-sex couples. However, the Department selectively quotes the testimony by Dr. Peplau. In reality, Dr. Peplau testified that gay people or gay couples do not have higher rates of domestic violence than heterosexual couples. R. 811. In the population-based study cited by Dr. Pe-plau, “the highest rate of domestic violence, defined as physical assault or rape ... was 20 percent, and that was for women in heterosexual relationships being attacked by their male partner.” R. 812. The rates for all other groups was lower. This was consistent with a study by the Centers for Disease Control, which found that over an eighteen-year period, ninety-five percent of female homicide victims were women killed by a male domestic partner. R. 814.[13]
With regard to break-ups of relationships, the Department acknowledges Dr. Peplau’s conclusion that unmarried heterosexual couples show break-up rates similar to homosexuals. R. 773. The same predictors for divorce apply to evaluate the likelihood of break-up in unmarried or same-sex couples. R. 769, 780. The predictors include age at marriage, education, family income, race or ethnicity, and religion. Dr. Peplau concluded that sexual orientation is not the strongest predictor of break-up among all the different demographic characteristics. R. 795. Other demographic factors “seem to have as strong or even stronger correlations with break-ups.” R. 795.
The Department claims that homosexual parents “support adolescent sexual activity and experimentations.” Initial Brief at 32. The Department claims to draw this from *91 the testimony of F.G.’s experts, but the experts did not say this. Dr. Lamb testified that research showed no difference between children of gay parents and heterosexual parents with respect to the age at which they initiated sexual activity. R. 1235.
Dr. Berlin testified that there is no evidence that the environment in which a child is raised, heterosexual or homosexual, would determine the sexual identity of the child who is raised in that environment. R. 1382-83. “[Tjhe overwhelming majority of homosexual individuals were raised in heterosexual households, suggesting that the environment in which they were raised in those instances certainly wasn’t the determining factor of their development. ...” R. 1383. Similarly, the overwhelming majority of those children raised in a gay environment turned out to be heterosexual, R. 1383, a point with which Department expert Schumm agreed. R. 1863.
The Department argues that placement of children with homosexuals presents a risk of discrimination and societal stigma. Here, too, the argument is misplaced. Florida already allows placement of children in foster care and guardianships with homosexual persons. This factor does not provide an argument for allowing such placements while prohibiting adoption. We reject the Department’s remaining arguments for the same reason: they do not provide a reasonable basis for allowing homosexual foster parenting or guardian-ships while imposing a prohibition on adoption.
In conclusion on the equal protection issue, the legislature is allowed to make classifications when it enacts statutes. Leicht, 402 So.2d at 1155. As a general proposition, a classification “will be upheld even if another classification or no classification might appear more reasonable.” Id. The classifications must, however, be “based on a real difference which is reasonably related to the subject and purpose of the regulation.” Id. (Emphasis added). “The reason for the equal protection clause was to assure that there would be no second class citizens.” Ostendorf v. Turner, 426 So.2d 539, 545-46 (Fla.1982).
Under Florida law, homosexual persons are allowed to serve as foster parents or guardians but are barred from being considered for adoptive parents. All other persons are eligible to be considered case-by-case to be adoptive parents, but not homosexual persons — even where, as here, the adoptive parent is a fit parent and the adoption is in the best interest of the children.
The Department has argued that evidence produced by its experts and F.G.’s experts supports a distinction wherein homosexual persons may serve as foster parents or guardians, but not adoptive parents. Respectfully, the portions of the record cited by the Department do not support the Department’s position. We conclude that there is no rational basis for the statute.
IX.
The trial court held that the statute violated the equal protection rights of the children in addition to violating the equal protection rights of F.G. Because we affirm the judgment on account of the violation of F.G.’s equal protection rights, we need not reach the claim of violation of the children’s equal protection rights.
The trial court made an alternative finding that “the statute infringes on the Children’s right to permanency pursuant to the Adoption and Safe Families Act of 1997, [42 U.S.C. § 671,] adopted in Chapter 39 of the Florida Statutes.” Final Judgment at 38. The Department con *92 tends that this ruling was erroneous. Because we affirm the declaration of unconstitutionality on the ground that there is an equal protection violation under the Florida Constitution, we need not reach the trial court’s alternative holding.
X.
We affirm the judgment of adoption, which holds subsection 63.042(3), Florida Statutes, violates the equal protection provision found in article I, section 2, of the Florida Constitution.[14]
APPENDIX
The Final Judgment sets forth the following facts stipulated by the parties. Those stipulated facts are reproduced verbatim here.

STIPULATED FACTS

Petitioner (F.G.), the Children through counsel and the Department agree as to the following undisputed facts:

Eligibility to adopt in Florida

1. State adoption law expressly permits unmarried adults to adopt children. Fla. Stat. § 63.042(2)(b).
2. The State makes over a third of its adoptive placements with single adults. The percentage of adoptions of dependent children in Florida that were by single parents for the year 2006 was 34.47%. Respondent’s Response to Petitioner’s First Request for Production of Documents (“RFP Response”) 19H.
3. Florida recognizes that single and married people can make equally good adoptive parents. Deposition of Kathleen Waters pursuant to Fla. R. Civ. P. 1.310(b)(6) (“Waters Dep.”), at 70.
4. DCF [The Department of Children and Families, or “Department”] and/or its agents recruit unmarried people to become adoptive parents. RFA Response 18; Waters Dep., at 70.
5. DCF and its agents will not approve an adoptive parent applicant who is not currently deemed suitable to care for a child based on speculation about the applicant’s improved future circumstances. RFA Response 12.
6. Florida does not exclude single adoptive parent applicants if they state an intent never to marry. Waters Dep., at 69.
7. The State and its designees accept applications to adopt from married couples and from single adults. Couples married less than two years must be given particularly careful evaluation. Fla. Admin. Code section 65C-16.005(3)(e).
8. The State recognizes that for certain children, single adoptive parents are preferred, even over available married couples. RFA Response 23.
9. No person eligible to adopt shall be prohibited from adopting solely because such person possesses a physical handicap, unless it is determined that such disability or handicap renders such person incapable of serving as an effective parent. Fla. Stat. § 63.042(4).
10. Adoptive parent applicants with serious or chronic medical conditions that could predictably compromise or could compromise the ability to provide the physical, emotional, social and economic support necessary for a child to thrive are subject to review by the Adoption Review Committee. Fla. Admin. Code section 65C-16.005(9)(1).
11. Florida does not exclude someone from adopting solely because of the fact *93 that he or she is HIV-positive. An individual who is HIV-positive but healthy and able to care for a child is not excluded if, after having a physical and a doctor stating the applicant is healthy and the child is not going to go through another loss.
12. The Department may not place a child with a person other than a parent if the criminal history records check reveals that the person has been convicted of any felony that falls within any of the following categories: (a) child abuse, abandonment, or neglect; (b) domestic violence; (c) child pornography or other felony in which a child was a victim of the offense; or (d) homicide, sexual battery, or other felony involving violence, other than felony assault or felony battery when an adult was the victim of the assault or battery. Fla. Stat. § 39.0138(2). The Department may not place a child with a person other than a parent if the criminal history records check reveals that the person has, within the [previous] 5 years, been convicted of a felony that falls within any of the following categories: (a) assault; (b) battery; or (c) a drug-related offense. Fla. Stat. § 39.0138(3). Individuals with any such convictions are not barred from adopting children who are not placed by the Department and/or its agents. And individuals convicted of any other crimes not referenced in Fla. Stat. § 39.0138(2) or (3) may be considered as adoptive parents even when the placement is made by DCF and/or its agents. Fla. Stat. § 39.0138(3); Fla. Admin. Code r. 65C-16.007(4).
13. Applicants who have been convicted of any felony specified in section 39.0138(3) within the last five years cannot be considered for approval until five years after the violation was committed and then must be referred to the adoption review committee.
14. Applicants who have been convicted of any felony specified in section 39.0138(2) shall be carefully evaluated as to the extent of their [re]habilitation. Fla. Stat. § 39.0138(2) and (3); Fla. Admin. Code r. 65C-16.007(4).
15. Adoption applicants who have previous verified findings of abuse, neglect or abandonment of a child are subject to a special review before they can be approved to adopt, but are not automatically disqualified from adopting. RFA Response 7.
16. Applicants who have experienced an adoption disruption or dissolution in the past are carefully evaluated but are not excluded from adoption on that basis alone. Fla. Admin. Code r. 65C-16.005(3)(d).
17. A social study which involves careful observation, screening and evaluation is made of the child and adoptive applicant prior to the placement of the child to select families who will be able to meet the physical, emotional, social, educational and financial needs of a child, while safeguarding the child from further loss and separation from primary caretakers. Fla. Admin. Code r. 65C-16.005(2).
18. Adoptive applicants in Florida seeking to adopt children who are in state custody are subjected to a home study, a reference check, a criminal records check, a child abuse registry check, and a medical screening. RFA Response 9; Fla. Admin. Code rr. 65C-16.005; 65C16.007.
19. Before DCF or its agents approve an applicant seeking to adopt a child, that applicant is individually screened to ensure that he or she can provide a safe, healthy, stable, nurturing environment for a child. RFA Response 10.
20. Unmarried couples are screened for relationship stability in the same way married couples jointly applying to adopt are screened.
21. Anyone deemed by DCF or its agents, after an individualized evaluation, *94 unable to provide a safe, healthy, stable, nurturing home for a child is not approved to adopt a child in Florida. RFA Response 11.
22. The percentage of adoptions of dependent children in Florida that were by the children’s foster parents in 2006 was 34.74%. RFP Response 191.
23. DCF is a member of the CWLA [Child Welfare League of America] and looks to its policies for guidance in developing best practices in child welfare. RFA Response 14.

Florida’s placement of children with lesbians and gay men

24. Lesbians and gay men are not prohibited by any state law, regulation or policy from serving as foster parents. RFA Response 1.
25. DCF and/or its agents have placed children in long-term foster care with individuals known by DCF and/or its agents to be lesbians or gay men. RFA Response 2.
26. DCF and/or its agents have placed children in the permanent care of foster parents know[n] by DCF and/or its agents to be lesbians or gay men. RFA Response 3.
27. Lesbians and gay men are not prohibited by any state law or regulation from being legal guardians of children in Florida. RFA Response 4.
28. DCF and/or its agents have placed children in the legal guardianship of individuals known by DCF and/or its agents to be lesbians or gay men, and ceased DCF supervision. RFA Response 5.
29. DCF and/or its agents have placed children in the permanent care of legal guardians known by DCF and/or its agents to be lesbians or gay men, and ceased DCF supervision. RFA Response 6.
30. There are no special considerations applied if the home study reveals that the foster parent is gay or lesbian. Deposition of Ada Gonzalez pursuant to Fla. R. Civ. P. 1.310(b)(6) (“Gonzalez Dep.”), at 63-64, 67.
31. DCF agrees that gay people and heterosexuals make equally good parents. Waters Dep., at 114.
32. The’qualities that make a particular applicant the optimal match for a particular child could exist in a heterosexual or gay person. Waters Dep., at 88.

Florida’s need for more adoptive parents

33. Florida seeks to find adoptive parents who are able to meet the unique needs of each child who is eligible for adoption and provide a secure and stable permanent family home. Fla. Admin. Code rr. 65C-16.002, 004 and 005; Fla. Stat. Section 409.166(1).
34. Florida has set up several programs to increase the pool of potential adoptive parents. See, e.g., Fla. Stats. §§ 409.166 (subsidies for adopting “special needs” children); 409.167 (statewide adoption exchange); 409.1755 (recruitment of adoptive parents for African American children); 409.401 (Interstate Compact on the Placement of Children to facilitate interstate adoption).
35. In 2006, there were 3,535 children in State custody and waiting to be adopted (RFP Response 19A) and as of March 20, 2007, 941 children were listed on the Adoption Exchange and had their pictures on the DCF’s recruitment website because more than 90 days had passed since termination of parental rights and no adoptive families were identified. RFP Response 19B; Waters Dep., at 30.
36. At any given point, there are about 900 to 1,000 children in Florida who need *95 adoptive parents to be recruited for them. Waters Dep., at 29-30.
37. 165 children in Florida aged out of the system in 2006 without ever being adopted. RFP Response 19D.
38. The average length of stay for children in foster care in Florida before a finalized adoption was over 30 months (data for fiscal year 2005/2006). RFP Response 19C.
39. DCF agrees that the shortage of adoptive parents is a serious problem. Waters Dep., at 72.
40. DCF agrees that having a bigger pool of qualified adoptive parents would help DCF find families for medically involved children, teens, large sibling groups and children with mental health problems. Waters Dep., at 32.

Guardianship

41. Where reunification with birth family is not possible, adoption — not guardianship — is the optimal goal for the child. Waters Dep., at 27; Gonzalez Dep., at 92.
42. Adoption is preferred over guardianship because it’s a cleaner legal resolution, it creates a forever relationship with the parents and stability. Deposition of Gay Frizzell pursuant to Fla. R. Civ. P. 1.310(b)(6) (“Frizzell Dep.”), at 57. In the case of adoption, a child feels a sense of belonging, that a legal commitment has been made to him. Frizzell Dep., at 58.
43. When children in foster care are placed in permanent guardianships with non-relatives, they are not entitled to adoption maintenance subsidies or Medicaid, which they would be entitled to if adopted. Waters Dep., at 28-29.

X.X.G. and N.R.G.

44. X.X.G., who is 8 years old, and N.R.G., who is 4, had to be placed in DCF custody because their biological parents were not able to take care of them and extended family resources were already overburdened caring for the boys’ other siblings.
45. X.X.G: and N.R.G. were placed by DCF and its agents in foster care with Petitioner and B.O. in December, 2004.
46. DCF and/or its agents were aware that Petitioner and B.O. where a same-sex couple when they licensed both men to be foster parents.
47. X.X.G. and N.R.G. are now free for adoption. A final judgment terminating their mother’s parental rights was entered on July 28, 2006. N.R.G.[’s] father’s parental rights were terminated on April 5, 2006. XX.G.’s father’s parental rights were terminated on July 25, 2006.
48. In September, 2006, Petitioner submitted an application to adopt X.X.G. and N.R.G. with the Center for Family and Child Enrichment (“CFCE”), an agency under contract with DCF to handle foster and adoptive placements of children in State custody.
49. CFCF conducted a preliminary home study in October, 2006. CFCF’s home study report included the results of criminal and child abuse registry checks and reference checks as well as an assessment of Petitioner and B.O.’s character, health, relationship, ability to care for children and home environment. CFCF’s home study report stated that although the caregiver meets suitability requirements, he lives an alternative lifestyle, which by Florida Statutes, precludes him from becoming an adoptive parent.
50. January 2, 2007, DCF sent a letter to Petitioner informing him that his applica *96 tion was denied based on Fla. Stat. § 63.042(3).
51. Since their placement in December 2004 with Petitioner and B.O., DCF and/or its agents have deemed this placement to be in X.X.G. and N.R.G. best interests. RFA Response 25.
52. Petitioner and B.O. are providing a safe, healthy, stable and nurturing home for X.X.G. and N.R.G. and meeting their physical, emotional, social and educational needs. RFA Response 26.
53. X.X.G. and N.R.G. are bonded to Petitioner and B.O. RFA Response 27.
54. But for Section [63.042(3) ], Fla. Stats., DCF would have approved Petitioner’s application to adopt X.X.G. and N.R.G. RFA Response 30.
55. Ron Gilbert, the Guardian ad Litem for X.X.G. and N.R.G., has stated his view that adoption by Petitioner is in the boys’ best interest.
56. One case worker supervising the family wrote in his review of Petitioner and B.O.: “Petitioner and B.O. have been model foster parents throughout the duration of the dependency case involving this child. There should be more foster parents of this quality and caliber. If there were more foster parents like these foster parents, the system would work more smoothly!” Bates Nos. 2655-59.

. We note that our ruling is unlikely to be the last word. The Florida Constitution states that a party may appeal to the Supreme Court of Florida when there is a decision of a district court of appeal “declaring invalid a state statute.” Art. V, § 3(b)(1), Fla. Const.

. The court wishes to express its appreciation for the briefs of amicus curiae which have been submitted in this case.

. F.G. was an experienced foster parent who had previously served as a foster parent for seven other children.

. The Family Center provides adoption services through a contract with the Department.

. We do not reach the argument advanced in the amicus brief filed by Talbot D’Alemberte and the Public Interest Law Center at the Florida State University College of Law which contends that a fundamental right to adopt was recognized in Grissom v. Dade County, 293 So.2d 59, 62 (Fla.1974), and Bower v. Conn. Gen. Life Ins. Co., 347 So.2d 439, 440 (Fla. 3d DCA 1977).

. A federal constitutional challenge to this statute was rejected in Lofton v. Secretary of Department of Children & Family Services, 358 F.3d 804 (11th Cir.), rehearing en banc denied, 377 F.3d 1275 (11th Cir.2004).

. Unless otherwise directed by the court, an investigation and recommendation is not required if the petitioner is a stepparent or blood relative. Id. § 63.125.

. There are, of course, homosexual persons who have their own biological children whom they raise. No one has suggested that such parents are unfit. As stated in the brief ami-cus curiae of the Family Law Section of The Florida Bar, "A parent's homosexuality is not a basis to terminate his or her parental rights. It is not a basis to deny that parent residential responsibility for his or her child or time-sharing with that child.” Brief at 13.

. As stated by the brief amicus curiae of the Family Law Section of The Florida Bar, "[A] person's homosexuality does not prevent that person from serving as a foster parent or as a guardian for a child. The only role that is precluded is that of adoptive parent. Clearly, this is a distinction without a difference.” Brief at 13.

. The brief amicus curiae of the American Psychological Association states, "Empirical research over the past two decades has failed to find meaningful differences in the parenting ability of gay and lesbian parents compared to heterosexual parents.” Brief at 15.

. Dr. Rekers opined at one point that he would favor removing children from foster parents who are homosexual persons even where the children have lived with the foster parents for ten years. R. 1736. He also said, however, that if he evaluated the F.G. household (which he had not done for this case), he might recommend continued foster placement. R. 1758.

. It would appear, however, that for purposes of adoption the time period of greatest interest is that which runs through the age of majority of the children. Dr. Rekers had no objection to having a child consent to an adoption after the child had reached the age of majority. R. 1758.

. Dr. Peplau explained that the variation among domestic violence studies is attributable to variation in the definition of domestic violence the researcher used. In some studies it is considered "domestic violence” if someone raises their voice or uses insulting language to their spouse or partner. Other researchers consider it domestic violence if there is a push or shove or someone breaks a dish. Yet other researchers are looking at instances of physical assault or rape. R. 811. The high rates the Department refers to involve verbal abuse. See R. 811.

. We need not certify a question of great public importance because the Department has a right to appeal to the Supreme Court of Florida. See supra note 1.