PARIENTE, J.
“The intangible fibers that connect parent and child have infinite variety. They are woven throughout the fabric of our society, providing it with strength, beauty, and flexibility. It is self-evident that they are sufficiently vital to merit constitutional protection in appropriate cases.” Lehr v. Robertson, 463 U.S. 248, 256, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983).
The parents in this case are two women, D.M.T. and T.M.H., who were involved in a long-term committed relationship when they agreed to jointly conceive and raise a child together as equal parental partners. Their child was conceived through the couple’s use of assisted reproductive technology, with T.M.H. providing the egg and D.M.T. giving birth to the child. After the child was born, the couple gave her a hyphenation of their last names, and both T.M.H. and D.M.T. participated in raising their child until their relationship soured and D.M.T. absconded with the child. T.M.H. now seeks to establish her parental rights to the child and also to reassume parental responsibilities. D.M.T., conversely, seeks to prevent T.M.H. from doing either. D.M.T. asserts that she, and she alone, should have the fundamental right to be the parent of the child. No other individual has asserted parental rights to the child, and no party or amicus curiae in this .case other than D.M.T. takes the position that T.M.H. should be denied her rights.[1]
In T.M.H. v. D.M.T., 79 So.3d 787 (Fla. 5th DCA 2011), the Fifth District Court of Appeal held that Florida’s assisted reproductive technology statute — section 742.14, Florida Statutes (2008) — did not apply to T.M.H., and that the trial court’s application of the statute was unconstitutional because it prevented T.M.H., who provided the egg for the couple, from asserting her parental rights to the child. Id. at 792, 798, 800. Because the Fifth District declared section 742.14 unconstitutional as applied to T.M.H., we have mandatory jurisdiction under article V, section 3(b)(1), of the Florida Constitution to review this case. In addition, the Fifth District certified a question of great public importance regarding whether the statute was unconstitutional, and we also have jurisdiction on that basis. See art. V, § 3(b)(4), Fla. Const.[2]
*328 We conclude that the statute is unconstitutional (1) as a violation of the Due Process Clause of the United States Constitution and separately as a violation of the Due Process Clause and privacy provision of the Florida Constitution; and (2) as a violation of the federal Equal Protection Clause and separately as a violation of the Florida Equal Protection Clause. In reaching our conclusion, we rely on longstanding constitutional law that an unwed biological father has an inchoate interest that develops into a fundamental right to be a parent protected by the Florida and United States Constitutions when he demonstrates a commitment to raising the child by assuming parental responsibilities. It is not the biological relationship per se, but rather “the assumption of the parental responsibilities which is of constitutional significance.” Matter of Adoption of Doe, 543 So.2d 741, 748 (Fla.1989).
Because the application of section 742.14 operated to automatically deprive T.M.H. of her ability to assert her fundamental right to be a parent, we conclude, based on the circumstances of this case, that the statute is unconstitutional as applied under the Due Process Clauses of the Florida and United States Constitutions and under the privacy provision of the Florida Constitution. Further, we hold that section 742.14, in combination with the restrictive definition of the term “commissioning couple” in section 742.13(2), also violates state and federal equal protection by denying same-sex couples the statutory protection against the automatic relinquishment of parental rights that it affords to heterosexual unmarried couples seeking to utilize the identical assistance of reproductive technology.
Accordingly, we affirm the Fifth District’s determination of statutory unconstitutionally and also answer the certified question in the affirmative, but we disapprove the Fifth District’s holding that the statute does not apply in this situation. Our holding that T.M.H. has rights deserving of constitutional protection does not mean that D.M.T.’s parental rights are not deserving of constitutional protection— quite the opposite. Our decision does not deny D.M.T. the right to be a parent to her child, but requires only that T.M.H.’s right to be a parent of the child be constitutionally recognized. D.M.T.’s preference that she parent the child alone is sadly similar to the views of all too many parents who, after separating, prefer to exclude the other parent from the child’s life. As the Fifth District wisely observed:
[D.M.T.] suggests that because she and [T.M.H.] have separated, a choice must be made. She posits that, as the birth mother, she should have exclusive parental rights to the child and that [T.M.H.], as the biological mother, should have no rights at all. If we were to accept [D.M.T.’s] argument that a choice must be made between the two, perhaps a Solomonic approach to resolving this dispute would be preferable, but we are neither possessed of the wisdom of Solomon nor are we able to apply his particular methodology under the law as we know it today. Parental rights, which include the love and affection an individual has for his or her child, transcend the relationship between two consenting adults, and we see nothing in this record that makes either [T.M.H. or D.M.T.] an exception that places those rights in one to the exclusion of the other. It is unknown what caused these two women to cross the proverbial line *329 between love and hate, but that is a matter between [T.M.H. and D.M.T.]. Their separation does not dissolve the parental rights of either woman to the child, nor does it dissolve the love and affection either has for the child.
T.M.H., 79 So.3d at 802-03.
We remain ever mindful that although our resolution of the constitutional issues revolves around the rights of T.M.H., the biological mother, we cannot and should not lose sight of the fact that there is a child at the center of this dispute whose best interests will ultimately determine the extent to which each parent will play a role in her life through legal rights and legal responsibilities. We therefore remand this case to the trial court to determine, based on the best interests of the child, issues such as parental time-sharing and child support, and we emphasize, as did the Fifth District, that an all-or-nothing choice between the two parents is not necessary.
FACTS AND PROCEDURAL HISTORY
The child at the center of this dispute was born on January 4, 2004. Her birth mother, D.M.T., and her biological mother, T.M.H., were in a long-term committed relationship at the time of the child’s birth, and the child began her life by living with both parents.[3] The Fifth District set forth the undisputed facts of this ease as follows:
[T.M.H.] and [D.M.T.] were involved in a committed relationship from 1995 until 2006. They lived together and owned real property as joint tenants, evidenced by a deed in the record. Additionally, both women deposited their income into a joint bank account and used those funds to pay their bills.
The couple decided to have a baby that they would raise together as equal parental partners. They sought reproductive medical assistance, where they learned [D.M.T.] was infertile. [T.M.H.] and [D.M.T.], using funds from their joint bank account, paid a reproductive doctor to withdraw ova from [T.M.H.], have them fertilized, and implant the fertilized ova into [D.M.T.]. The two women told the reproductive doctor that they intended to raise the child as a couple, and they went for counseling with a mental health professional to prepare themselves for parenthood. The in vitro fertilization procedure that was utilized proved successful, and a child was conceived.
The child was born in Brevard County on January 4, 2004. The couple gave the child a hyphenation of their last names. Although the birth certificate lists only [D.M.T.] as the mother and does not indicate a father, a maternity test revealed that there is a 99.99% certainty that [T.M.H.] is the biological mother of the child. [T.M.H.] and [D.M.T.] sent out birth announcements with both of their names declaring, “We Proudly Announce the Birth of Our Beautiful Daughter.” Both women participated at their child’s baptism, and they both took an active role in the child’s early education.
The women separated in May 2006, and the child lived with [D.M.T.]. Initially, [T.M.H.] made regular child support payments, which [D.M.T.] accepted. [T.M.H.] ended the support payments *330 when she and [D.M.T.] agreed to divide the child’s time evenly between them. They continued to divide the costs of education.
T.M.H., 79 So.3d at 788-89.
Eventually, the couple’s relationship severely deteriorated, and, as is all too commonly seen in child custody proceedings, one parent, D.M.T., unfortunately severed the other parent’s, T.M.H.’s, contact with the daughter the couple had jointly planned for, conceived, and raised as a family. Id. Until that time, the child “did not distinguish between one [woman] being the biological or the birth parent.” Id. at 789. Each party was simply a parent to this child up until and including the point at which D.M.T., the birth mother, absconded to an undisclosed location with the child after the parties’ relationship soured. See id.
After finally locating the birth mother in Australia, T.M.H., the biological mother, served the birth mother with a petition to establish parental rights to the couple’s child and for declaratory relief, including an adjudication of parentage pursuant to chapter 742, Florida Statutes (2008), and a declaration of statutory invalidity with respect to section 742.14, the assisted reproductive technology statute. T.M.H., 79 So.3d at 789 n. 1, 799. Section 742.14 provides that, except in the case of a “commissioning couple” — defined in section 742.13 as the intended mother and father of a child who will be conceived through assisted reproductive technology using the biological material of at least one of the intended parents — and fathers who have executed a preplanned adoption agreement, an egg or sperm donor must relinquish any claim to parental rights or obligations to the donation or the resulting child. See §§ 742.13(2), 742.14, Fla. Stat.
In response to the biological mother’s action, the birth mother filed a motion for summary judgment, alleging that the biological mother lacked parental rights as a matter of law regardless of the couple’s original intent with respect to raising the child. The trial court held a hearing and granted the birth mother’s summary judgment motion, explaining that it felt constrained by the current state of the law and expressing hope that an appellate court would reverse its ruling by stating as follows:
First, let me say, I find that [the birth mother’s] actions to be — this is my phraseology — morally reprehensible. I do not agree with her actions relevant to the best interest of the child. However, that is not the standard. There is no distinction in law or recognition of rights of the biological mother verses a birth mother. ...
[[Image here]]
Same-sex partners do not meet the definition [in section 74.2.13(2) ] of commissioning couple. There really is no protection for [the biological mother] under Florida law because she could not have adopted this child to prevent this current set of circumstances. I do not agree with the current state of the law, but I must uphold it....
[[Image here]]
And, [to the biological mother], if you appeal this, I hope I’m wrong.
(Emphasis added.) The trial court therefore found both that the birth mother and the biological mother, as a same-sex couple, could not meet the definition of a “commissioning couple,” as the term is defined in section 742.13(2) and used in section 742.14, to be exempt from the relinquishment of parental rights, and that Florida law does not recognize the rights of a biological mother versus a birth mother.
*331 The biological mother appealed the trial court’s ruling to the Fifth District Court of Appeal. Identifying this as a case of first impression in Florida, the Fifth District reversed the trial court’s decision and held that the trial court’s interpretation and application of the statute violated the biological mother’s constitutional rights. T.M.H., 79 So.3d at 800. Recognizing the rich body of federal and state constitutional law that would unquestionably give constitutionally protected rights to a biological father in the exact situation presented by the facts of this ease, id. at 797-98, the Fifth District concluded that the biological mother is “entitled to constitutionally protected parental rights to the child and that the statutory relinquishment of those rights under section 742.14 is prohibited by the Federal and Florida Constitutions.” Id. at 798.
In its analysis of the issues presented, the Fifth District reviewed the trial court’s determination that the biological mother is a “donor” as that term is used in section 742.14 and that the statute therefore applies to deprive her of parental rights to her child. Id. at 790-91. Acknowledging that the facts in this ease are undisputed, the Fifth District found that the biological mother “would not be a donor ... because she did not intend to give her ova away.” Id. at 792. “Rather,” the Fifth District explained, “she always intended to be a mother to the child born from her ova and was a mother to the child for several years after [the child’s] birth.” Id.
After concluding that section 742.14 did not apply to the biological mother, the Fifth District then addressed the birth mother’s contention that the biological mother had relinquished her parental rights to the child, rejecting two aspects of this argument. First, the Fifth District explained that the biological mother’s protected parental rights could not, consistent with the Florida and United States Constitutions, be extinguished through the trial court’s application of section 742.14, stating as follows:
Here, it is undisputed that [the biological mother] formed and maintained a parental relationship for several years after the child was born, and she did so as an equal parental partner with [the birth mother] who, for all that time, never suggested that [the biological mother] had relinquished her parental rights to her child. We believe that [the biological mother] has constitutionally protected rights as a genetic parent who has established a parental relationship with her genetic offspring that transcend the provisions of section 742.14.
Id. at 797.
Second, the Fifth District addressed and rejected the contention that the biological mother had relinquished her rights by signing an informed consent form in the reproductive doctor’s office, concluding that the preprinted form did not constitute a waiver. Id. at 802. In explaining its reasoning regarding the “significant factors” that informed this conclusion, the Fifth District stated that “both women agreed to raise any child born with the ova supplied by [the biological mother] as equal parental partners and both women complied with that agreement for several years after the child was born.” Id. at 801. The Fifth District found it “very revealing” that the birth mother “never attempted to assert this waiver claim until she decided to take the child to Australia and deprive [the biological mother] of any further contact with the child.” Id.
Judge Monaco separately wrote a concurring opinion, which was joined by Judge Sawaya, further emphasizing the Fifth District’s conclusion that section 742.14 does not apply to T.M.H. because the statute “was not designed to resolve *332 the problem of how to treat children born by in vitro fertilization to a same-sex couple.” Id. at 803 (Monaco, J., concurring). Judge Lawson dissented both as to the Fifth District’s statutory construction and constitutional analysis, based on his belief that the birth mother is the sole legal mother of the child under established common law and Florida’s statutory scheme. Id. at 805-06 (Lawson, J., dissenting).
ANALYSIS
With this factual and procedural background established, we now proceed to analyze the important constitutional issues presented in this case.[4] Our analysis begins with a brief overview of the statutory provisions implicated, including our determination of whether section 742.14 is applicable to the circumstances presented. Concluding that the statute applies, we then turn to a discussion of T.M.H.’s constitutional challenges to the statute’s validity. In this regard, we review the constitutional protections for parenting, determine the nature of T.M.H.’s interest, and analyze whether sections 742.13(2) and 742.14 violate the state and federal constitutional guarantees of due process, privacy, and equal protection. Finally, we address and reject D.M.T.’s argument that T.M.H. waived any interest she may have in the child by signing a standard informed consent form in the course of the couple’s use of assisted reproductive technology to conceive a child.
I. Sections 742.13 and 742.14
In the decision below, the Fifth District determined that section 742.14, the assisted reproductive technology statute, did not apply to T.M.H., the biological mother, in this situation because she is not a “donor” as that term is used in the statute.[5] We disagree with the Fifth District as to the statutory construction analysis because we conclude that the statute does, on its face, apply to T.M.H. as the provider of the egg for the couple.
Our interpretation of section 742.14 and the related provision in section 742.13 defining the term “commissioning couple,” as well as our determination of the statutes’ constitutionality, are pure questions of law, subject to de novo review. See City of Miami v. McGrath, 824 So.2d 143, 146 (Fla.2002). “A court’s purpose in construing a statute is to give effect to legislative intent, which is the polestar that guides the court in statutory construction.” Larimore v. State, 2 So.3d 101, 106 (Fla.2008). “As with any case of statutory construction, [the Court must] begin with the ‘actual language used in the statute.’ ” Heart of Adoptions, Inc. v. J.A., 963 So.2d 189, 198 (Fla.2007) (quoting Borden v. East-European Ins. Co., 921 So.2d 587, 595 (Fla.2006)). “A basic tenet of statutory interpretation is that a ‘statute should be interpreted to give effect to every clause in it, and to accord meaning and harmony to all of its parts.’ ” Jones v. ETS of New Orleans, Inc., 793 So.2d 912, 914-15 (Fla.2001) (quoting Acosta v. Richter, 671 So.2d 149, 153-54 (Fla.1996)). Fur *333 ther, we necessarily must read sections 742.13 and 742.14 together. See Fla. Dep’t of State, Div. of Elections v. Martin, 916 So.2d 763, 768 (Fla.2005).
Section 742.14, which is Florida’s assisted reproductive technology statute, is entitled “Donation of eggs, sperm, or preembryos” and has provided as follows since 1993:
The donor of any egg, sperm, or preem-bryo, other than the commissioning couple or a father who has executed a preplanned adoption agreement under s. 63.212, shall relinquish all maternal or paternal rights and obligations with respect to the donation or the resulting children. Only reasonable compensation directly related to the donation of eggs, sperm, and preembryos shall be permitted.
§ 742.14, Fla. Stat. (emphasis added). The term “commissioning couple,” as used in section 742.14, is defined in section 742.13(2) as “the intended mother and father of a child who will be conceived by means of assisted reproductive technology using the eggs or sperm of at least one of the intended parents.” § 742.13(2), Fla. Stat. (emphasis added).[6]
The Fifth District concluded that the assisted reproductive technology statute did not apply to T.M.H. since she always intended to parent the child conceived through her provision of biological material to her partner. T.M.H., 79 So.3d at 792, 803-04. Therefore, according to the Fifth District, T.M.H. is not considered a “donor” as that term is used in the statute. Id.
We reject the Fifth District’s construction of the assisted reproductive technology statute. The plain language of section 742.14 does not provide for the subjective intentions of someone in T.M.H.’s position to be taken into consideration in determining whether he or she is a “donor” under the terms of the statute. Rather, the statute identifies only two categories of individuals who do not relinquish parental rights as to their provision of biological material during the course of assisted reproductive technology—(1) members of a “commissioning couple”; and (2) fathers who have executed a preplanned adoption agreement. Indeed, the structure of section 742.14 designates these groups as fitting within the term “donor,” and then provides that they are specifically exempted from the statutory relinquishment of parental rights. See § 742.14, Fla. Stat. If the statute did not apply to these groups, then they would not need to be exempted from its requirements.
In providing for these two exceptions, the Legislature expressed its intent not to allow the subjective intentions of all other individuals who provide eggs, sperm, or preembryos during the course of assisted reproductive technology to become an issue in need of litigation. See Pro-Art Dental Lab, Inc. v. V-Strategic Group, LLC, 986 So.2d 1244, 1258 (Fla.2008) (“Under the canon of statutory construction expressio unius est exclusio alterius, the mention of one thing implies the exclusion of another.” (quoting State v. Hearns, 961 So.2d 211, 219 (Fla.2007))). Instead, the Legislature articulated a policy of treating all individuals who provide eggs, sperm, or preembryos as part of assisted reproductive technology as “donor[s]” bound by the terms of the statute, and then exempting two specific groups in accordance with the purpose behind the statutory enactment.
To hold that section 742.14 does not apply to T.M.H. in this case because of her subjective intention not to give her egg *334 away would essentially create a third exception in the statute. This Court, however, is “not at liberty to add words to the statute that were not placed there by the Legislature.” Lawnwood Med. Ctr., Inc. v. Seeger, 990 So.2d 503, 512 (Fla.2008).
It is clear that the primary purpose behind the Legislature’s enactment of the assisted reproductive technology statute was to ensure that couples taking advantage of medical advances in reproductive science to conceive a child are protected from a claim to parental rights by a third-party provider of the genetic material used for assisted reproductive technology. In this regard, we emphasize that our resolution of the constitutional issues presented in this case does not undermine the statutory protections or certainty provided to commissioning couples in any way. Rather, the specific constitutional question we address next is whether these very protections against the statutory relinquishment of parental rights can be denied to an unmarried woman who was part of a same-sex couple seeking the assistance of reproductive technology to conceive a child to jointly raise and who provided biological material to her partner with the specific intent to become a parent.
II. The Constitutionality of the Statutes
We begin our constitutional analysis of section 742.14, and the corresponding provision in section 742.13 defining the term “commissioning couple,” by addressing T.M.H.’s due process and privacy arguments that application of the assisted reproductive technology statute abridges her fundamental right to be a parent. We then address the equal protection argument that section 742.14, in combination with section 742.18(2), unconstitutionally creates an unreasonable classification based on sexual orientation. We hold that section 742.14 is unconstitutional as applied on each basis under both the United States Constitution and separately under the Florida Constitution.
A. Denial of Due Process Under the Florida and United States Constitutions and Denial of Right to Privacy Under the Florida Constitution

1. Constitutional Right of Parenting

It is a basic tenet of our society and our law that individuals have the fundamental constitutionally protected rights to procreate and to be a parent to their children. These constitutional rights are recognized by both the Florida Constitution and the United States Constitution. As stated by the United States Supreme Court in Troxel v. Granville, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), “the interest of parents in the care, custody, and control of their children ... is perhaps the oldest of the fundamental liberty interests recognized” in American law. See also Skinner v. Okla. ex rel. Williamson, 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942) (stating that procreation is “one of the basic civil rights of man” and is “fundamental to the very existence and survival of the race”); Beagle v. Beagle, 678 So.2d 1271, 1276 (Fla.1996) (recognizing that parents’ fundamental right to raise their children is protected by Florida’s state constitutional right of privacy); In re Adoption of Baby E.A.W., 658 So.2d 961, 966 (Fla.1995) (“The United States Supreme Court has held that natural parents have a fundamental liberty interest in the care, custody, and management of their children.” (citing Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982))).
This Court has previously explained that the fundamental right to have children is a right “so basic as to be inseparable from the rights to ‘enjoy and defend life and liberty, (and) to pursue happi *335 ness.’ ” Grissom v. Dade Cnty., 293 So.2d 59, 62 (Fla.1974) (quoting art. I, § 2, Fla. Const.). A “parent’s desire for and right to ‘the companionship, care, custody, and management of his or her children’ is an important interest that ‘undeniably warrants deference and, absent a powerful countervailing interest, protection.’ ” Lassiter v. Dep’t of Soc. Servs., 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (quoting Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)).
Both the Florida and the United States Constitutions “protect individuals from arbitrary and unreasonable governmental interference with a person’s right to life, liberty, and property.” State v. Robinson, 873 So.2d 1205, 1212 (Fla.2004); see U.S. Const, amend. XIV, § 1 (“[N]or shall any State deprive any person of life, liberty, or property, without due process of law.”); art. I, § 9, Fla. Const. (“No person shall be deprived of life, liberty or property without due process of law .... ”). In addition, the Florida Constitution contains a separate privacy protection declaring that an individual in this state “has the right to be let alone and free from governmental intrusion into the person’s private life.” Art. I, § 23, Fla. Const.
This Court has interpreted the Florida Constitution’s privacy provision to provide “greater protection than is afforded by the federal constitution” and to include specific protection against State interference in “parents’ fundamental right to raise their children except in cases where the child is threatened with harm.” Beagle, 678 So.2d at 1275-76. Indeed, we have previously stated that, in Florida, an individual’s “fundamental liberty interest in parenting ... is specifically protected by our [state constitutional] privacy provision.” Id. at 1275.
Moreover, “we recognize the sanctity of the biological connection” between parents and children, and thus, “we look carefully at anything that would sever the biological parent-child link.” Baby E.A.W., 658 So.2d at 967. With respect to the link between a biological father and his child, we have previously explained that constitutional protection of the individual’s right to be a parent applies “when an unwed [biological] father demonstrates a full commitment to the responsibilities of parenthood by coming forward to participate in raising his child.” Id. at 966-67. The approach this Court has taken regarding the rights of biological but unwed fathers echoes the United States Supreme Court’s recognition that a biological father’s constitutional rights are inchoate and develop into a fundamental right to be a parent “[w]hen an unwed father demonstrates a full commitment to the responsibilities of parenthood by ‘com[ing] forward to participate in the rearing of his child,’ ... [because] his interest in personal contact with his child acquires substantial protection under the due process clause.” Lehr, 463 U.S. at 261, 103 S.Ct. 2985 (alteration in original) (emphasis added) (quoting Caban v. Mohammed, 441 U.S. 380, 392, 398 n. 7, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979)).
When the Due Process Clause is “invoked in a novel context,” the United States Supreme Court has explained that the inquiry should begin “with a determination of the precise nature of the private interest that is threatened by the State.” Lehr, 463 U.S. at 256, 103 S.Ct. 2985. Although the dissent asserts that the majority skips an important step in analyzing the due process claim, the case it relies on for this proposition, Snyder v. Massachusetts, 291 U.S. 97, 105, 54 S.Ct. 330, 78 L.Ed. 674 (1934), concerns an issue of criminal procedure, a far cry from the *336 “liberty” interest in parents’ fundamental right to the “care, custody, and control of their children.” Troxel, 530 U.S. at 65, 120 S.Ct. 2054. As explained by the United States Supreme Court in Troxel:
The liberty interest at issue in this case — the interest of parents in the care, custody, and control of their children — is perhaps the oldest of the fundamental liberty interests recognized by this Court. More than 75 years ago, in Meyer v. Nebraska, 262 U.S. 390, 399, 401 [43 S.Ct. 625, 67 L.Ed. 1042] (1923), we held that the “liberty” protected by the Due Process Clause includes the right of parents to “establish a home and bring up children” and “to control the education of their own.” Two years later, in Pierce v. Society of Sisters, 268 U.S. 510, 534-535 [45 S.Ct. 571, 69 L.Ed. 1070] (1925), we again held that the “liberty of parents and guardians” includes the right “to direct the upbringing and education of children under their control.” We explained in Pierce that “[t]he child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations.” Id., at 535 [45 S.Ct. 571]. We returned to the subject in Prince v. Massachusetts, 321 U.S. 158 [64 S.Ct. 438, 88 L.Ed. 645] (1944), and again confirmed that there is a constitutional dimension to the right of parents to direct the upbringing of their children. “It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.” Id., at 166 [64 S.Ct. 438].
In subsequent cases also, we have recognized the fundamental right of parents to make decisions concerning the care, custody, and control of their children. See, e.g., Stanley v. Illinois, 405 U.S. 645, 651 [92 S.Ct. 1208, 31 L.Ed.2d 551] (1972) (“It is plain that the interest of a parent in the companionship, care, custody, and management of his or her children ‘come[s] to this Court with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic arrangements’ ” (citation omitted)); Wisconsin v. Yoder, 406 U.S. 205, 232 [92 S.Ct. 1526, 32 L.Ed.2d 15] (1972) (“The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition”); Quilloin v. Walcott, 434 U.S. 246, 255 [98 S.Ct. 549, 54 L.Ed.2d 511] (1978) (“We have recognized on numerous occasions that the relationship between parent and child is constitutionally protected”); Parham v. J.R., 442 U.S. 584, 602 [99 S.Ct. 2493, 61 L.Ed.2d 101] (1979) (“Our jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children. Our cases have consistently followed that course”); Santosky v. Kramer, 455 U.S. 745, 753 [102 S.Ct. 1388, 71 L.Ed.2d 599] (1982) (discussing “[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child”); [Washington v. Glucksberg, 521 U.S. 702, 720, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) ] (“In a long line of cases, we have held that, in addition to the specific freedoms protected by the Bill of Rights, the ‘liberty’ specially protected by the Due Process Clause includes the righ[t] ... to direct the education and upbringing of one’s children” (citing Meyer and Pierce)). In light of *337 this extensive precedent, it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children.
Troxel, 580 U.S. at 65-66, 120 S.Ct. 2054.
Further, in the dissent’s assertion that the majority of this Court “improperly constitutionalize[s]” its preferences and “impose[s] them upon the rest of the citizenry,” dissenting op. at 64, the dissent relies on a plurality opinion written by Justice Scalia in Michael H. v. Gerald D., 491 U.S. 110, 122, 109 S.Ct. 2383, 105 L.Ed.2d 91 (1989), and a view actually called into question by two of those concurring in the plurality. See id. at 132, 109 S.Ct. 2333 (O’Connor, J., concurring in part). Rather, it would appear that it is the dissent that is attempting to impose its personal preferences for a view of family.
The legal parameters and definitions of parents, marriage, and family have undergone major changes in the past several decades, from holding a state’s ban on interracial marriage unconstitutional, see Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), to recognizing the fundamental right to be a parent even for unmarried couples, see Stanley, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551. In fact, although not impacting our ultimate analysis, as the United States Supreme Court has recently declared in acknowledging that many states have extended the definition of family to permit the legal marriage of same-sex couples, federal law may not infringe upon the rights of those couples “to enhance their own liberty” and to enjoy protection “in personhood and dignity.” United States v. Windsor, - U.S. -, 133 S.Ct. 2675, 2694,186 L.Ed.2d 808 (2013).
In this case, the biological mother asserts that she has a protected constitution-
al interest to be a parent to her child, which is a fundamental right unquestionably protected by the Florida and federal Due Process Clauses and specifically by Florida’s state constitutional privacy provision. While acknowledging that a mere biological link between parent and child is insufficient to merit substantial constitutional protection, the biological mother argues that we should analogize the nature of her interest to the interest possessed by unwed biological fathers, whose parental rights are inchoate but develop into a fundamental right to be a parent when the biological father demonstrates “a full commitment to the responsibilities of parenthood.” T.M.H., 79 So.3d at 797. We agree.
This Court has previously stated that the biological relationship between parent and child provides “the opportunity to assume parental responsibilities.” Doe, 543 So.2d at 748. In other words, although an unmarried man who impregnates an unmarried woman does not automatically have a fundamental right to be a parent to the child, his right to be a parent develops substantial constitutional protection as a fundamental right if he assumes responsibility for the care and raising of that child. See Baby E.A.W., 658 So.2d at 966-67.
In Lehr, the United States Supreme Court articulated the “significance of the biological connection” between parent and child, which the Court described as the biological father’s “opportunity that no other male possesses to develop a relationship with his offspring.” 463 U.S. at 262, 103 S.Ct. 2985. If the biological father “grasps that opportunity and accepts some measure of responsibility for the child’s future,” the Court explained, then “he may enjoy the blessings of the parent-child relationship and make uniquely valu *338 able contributions to the child’s development.” Id. As the United States Supreme Court has pronounced and this Court has stated, therefore, a biological connection gives rise to an inchoate right to be a parent that may develop into a protected fundamental constitutional right based on the actions of the parent. See Baby E.A.W., 658 So.2d at 966-67.
In this case, the biological connection between mother and daughter is not in dispute. See T.M.H., 79 So.3d at 789. Additionally, T.M.H. and her former partner D.M.T. demonstrated an intent to jointly raise the child through their actions before and after the child’s birth, and T.M.H. actively participated as a parent for the first several years of the child’s life. Importantly for constitutional purposes, T.M.H. also assumed full parental responsibilities until her contact with her child was suddenly cut off. In this way, this case is wholly unlike cases such as Lamaritata v. Lucas, 823 So.2d 316, 319 (Fla. 2d DCA 2002), relied on by the dissent, where the parties seeking the assistance of reproductive technology “joined forces solely for the purpose of artificially inseminating Ms. Lamaritata” and specifically agreed that the individual providing genetic material would not have any rights or obligations with respect to the child.
This case is also completely different from cases involving nonparents seeking to establish legal rights to a child, such as Beagle, 678 So.2d 1271, which involved grandparents’ rights, and Troxel, which is relied on by the dissent. Troxel concerned a state nonparental visitation statute described as “breathtakingly broad,” permitting “[a]ny person” to petition the court for visitation rights “at any time,” and the court to grant such visitation rights whenever “visitation may serve the best interest of the child.” Troxel, 530 U.S. at 61, 67, 120 S.Ct. 2054.
Contrary to Troxel, which involved a nonparent, there is no doubt that the common law would grant constitutional due process and privacy protection, in the form of a fundamental right to be a parent, to an unwed biological father in this situation who had the proverbial one night stand with a mother but then assumed parental responsibilities for the first several years of the child’s life. Of course, the common law was developed before the scientific advancements in reproductive technology that allow individuals to exercise their basic right and desire to have children in ways that were not contemplated by society centuries or even decades ago.
As explained by the Fifth District in this case, it is difficult to understand how rigid legal rules “established during a time so far removed in history when the science of in vitro fertilization was a remote thought in the minds of the scientists of the times [have] much currency today.” T.M.H., 79 So.3d at 796. Although the right to procreate has long been described as “one of the basic civil rights” individuals hold, Skinner, 316 U.S. at 541, 62 S.Ct. 1110, advances in science and technology now provide innumerable ways for traditional and non-traditional couples alike to conceive a child and, we conclude, in so doing to exercise their “inalienable rights ... to enjoy and defend life and liberty, [and] to pursue happiness.” Art. I, § 2, Fla. Const.; see Grissom, 293 So.2d at 62. The Fifth District cogently explained this proposition as follows:
Our analysis reveals that there is nothing in chapter 742, and specifically section 742.14, that addresses the situation where the child has both a biological mother and a birth mother who were engaged in a committed relationship for many years and who decided to have a child to love and raise together as equal parental partners. This is a unique *339 case, and the appellate courts in Florida have never before considered a case quite like it. Based on the facts and circumstances of this case, we can discern no legally valid reason to deprive either woman of parental rights to this child. The women were in a committed relationship for many years and both decided and agreed to have a child born out of that relationship to love and raise as their own and to share parental rights and responsibilities in rearing that child. Specifically, when it was discovered that [the birth mother] was infertile, both women agreed to have ova removed from [the biological mother], to have them artificially inseminated with the sperm of a donor, and to have the ova inserted into [the birth mother’s] womb, in order to conceive a child that they would raise together as parental partners. After the child was born, both women were parents to the child and equally cared for the child for several years.
T.M.H., 79 So.3d at 790.
It would indeed be anomalous if, under Florida law, an unwed biological father would have more constitutionally protected rights to parent a child after a one night stand than an unwed biological mother who, with a committed partner and as part of a loving relationship, planned for the birth of a child and remains committed to supporting and raising her own daughter. As the Fifth District stated, “it would pose a substantial equal protection problem to deny an unwed genetic mother the ability to assert parental rights after she established a parental relationship with her child while allowing an unwed genetic father to do so.” T.M.H., 79 So.3d at 797 n. 8.
Although the biological mother in this case is seeking vindication of her right to be a parent to her child, this right comes with critical legal and financial responsibilities, including possible child support payments. See § 61.29, Fla. Stat. (2012) (“The following principles establish the .public policy of the State of Florida in the creation of the child support guidelines: (1) Each parent has a fundamental obligation to support his or her minor or legally dependent child.”). Unquestionably, these responsibilities are part and parcel of the fundamental right to be a parent. T.M.H., the biological mother, demonstrated her commitment to accepting these responsibilities until her contact with the child was cut off. Because T.M.H. accepted responsibility for raising her child from the beginning and did in fact parent and support the child until D.M.T. prevented her from doing so, we hold that T.M.H.’s inchoate interest has developed into a protected fundamental right to be a parent to her child.

2. Abridgment of Fundamental Right

We subject statutes that interfere with an individual’s fundamental rights to strict scrutiny analysis, which requires the State to prove that the legislation furthers a compelling governmental interest through the least intrusive means. See N. Fla. Women’s Health & Counseling Servs., Inc. v. State, 866 So.2d 612, 625 n. 16 (Fla.2003); see also Winfield v. Div. of Pari-Mutuel Wagering, Dep’t of Bus. Regulation, 477 So.2d 544, 547 (Fla.1985) (stating that Florida’s “right of privacy is a fundamental right which ... demands the compelling state interest standard”). It is well settled that “a law that impinges upon a fundamental right explicitly or implicitly secured by the Constitution is presumptively unconstitutional.” City of Mobile, Ala. v. Bolden, 446 U.S. 55, 76, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). Indeed, the Constitution “provides heightened protection against government interference with certain fundamental rights and liberty in *340 terests,” including the right “to have children.” Glucksberg, 521 U.S. at 720, 117 S.Ct. 2258.
In this case, it is clear that application of section 742.14 forces the automatic statutory relinquishment of T.M.H.’s “right to form a parental relationship with her child and to continue to participate in raising the child as a parent as she had done for several years after the child was born.” T.M.H., 79 So.3d at 796. We have concluded that T.M.H.’s right to maintain that relationship, as the biological parent of the child who has demonstrated “a full commitment to the responsibilities of parenthood,” Lehr, 463 U.S. at 261, 103 S.Ct. 2985, is a fundamental right deserving of constitutional protection under the Due Process Clauses of the Florida and United States Constitutions and Florida’s constitutional privacy provision. Therefore, the burden falls on the birth mother to demonstrate that application of the assisted reproductive technology statute to deprive the biological mother of her fundamental right to be a parent furthers a compelling governmental interest through the least intrusive means. This showing has not been made.
We recognize the important role section 742.14 plays in protecting couples seeking to use assisted reproductive technology to conceive a child from parental rights claims brought by typical third-party providers of the genetic material used in assisted reproductive technology, as well as the State’s corresponding interest in furthering that objective. This case, however, does not implicate those concerns. Quite simply, based on the factual situation before us, we do not discern even a legitimate State interest in applying section 742.14 to deny T.M.H. her right to be a parent to her daughter.
This is significant to our as-applied constitutional analysis of the statutory scheme, which is intended to provide statutory protection to a “commissioning couple” from a parental rights claim by a third-party provider of biological material used in assisted reproductive technology. We therefore reject the dissent’s assertion that our analysis has no “logical end point” or “obvious stopping point,” dissenting op. at 356, as our conclusion is based on the specific facts presented in this case, as set forth in the Fifth District’s certified question, which establish that T.M.H. was an intended parent and assumed full parental responsibilities until her contact with the child was cut off.[7]
In recently addressing a comparable claim brought by a parent who provided biological material for use in conceiving *341 a child through assisted reproductive technology and thereafter demonstrated a commitment to raising that child, the Virginia Supreme Court explained that “there is no compelling reason why a responsible, involved, unmarried, biological parent should never be allowed to establish legal parentage of her or his child born as a result of assisted conception.” L.F. v. Breit, 285 Va. 163, 736 S.E.2d 711, 722 (2013). While the Virginia assisted conception statute is different from our own, we embrace the Virginia Supreme Court’s conclusion regarding whether a compelling interest exists.
Like the parties in the Virginia case, T.M.H. and D.M.T. were known to each other, lived together as a couple, and jointly assumed rights and responsibilities for their daughter after her birth. Indeed, the child in the Virginia case was over one year old at the time the intended father’s contact was cut off, see id. at 715, but the child in this case was almost four years old at the time D.M.T. prevented T.M.H. from having further contact with her.
We conclude that the State does not have a compelling interest in depriving T.M.H. of her right to be a parent in this situation. Accordingly, we hold that section 742.14 is unconstitutional as applied to abridge T.M.H.’s fundamental right to be a parent.
B. Classification Based on Sexual Orientation
We next address the equal protection challenge to the statute, as confronted by the Fifth District, under both the Florida and United States Constitutions. Specifically, as encompassed in the certified question, we address whether the statute is unconstitutional as applied under the Florida and federal Equal Protection Clauses by exempting heterosexual couples, but not same-sex couples, from the automatic relinquishment of parental rights when seeking the assistance of reproductive technology to conceive a child with the intent to become the child’s parents. Put another way, as Judge Monaco succinctly explained in his concurring opinion below, “[b]ut for the fact that [the biological mother] and [the birth mother] are of the same sex, we would probably consider them to be a ‘commissioning couple’ under the statute, and the outcome of this case would be easy.” T.M.H., 79 So.3d at 804 (Monaco, J., concurring).
The constitutional guarantee of equal protection “is essentially a direction that all persons similarly situated should be treated alike.” City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (quoting Plyler v. Doe, 457 U.S. 202, 216, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982)). Indeed, “the Constitution ‘neither knows nor tolerates classes among citizens,’ ” which is an assurance that the law remains neutral “where the rights of persons are at stake.” Romer v. Evans, 517 U.S. 620, 623, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) (quoting Plessy v. Ferguson, 163 U.S. 537, 559, 16 S.Ct. 1138, 41 L.Ed. 256 (1896) (Harlan, J., dissenting)).
“In the absence of a fundamental right or a protected class, equal protection demands only that a distinction which results in unequal treatment bear some rational relationship to a legitimate state purpose.” Duncan v. Moore, 754 So.2d 708, 712 (Fla.2000). Conversely, where the equal protection challenge does abridge a fundamental right or adversely affect a protected class, a higher level of scrutiny is appropriate. See Lane v. Chiles, 698 So.2d 260, 263 (Fla.1997).
Sexual orientation has not been determined to constitute a protected class and therefore sexual orientation does not provide an independent basis for using *342 heightened scrutiny to review State action that results in unequal treatment to homosexuals. See Romer, 517 U.S. at 630-32, 116 S.Ct. 1620 (applying rational basis review to a state constitutional- amendment banning state or local governments from providing minority protections based on sexual orientation). Further, even though our state constitution recognizes gender as a specific class, see art. I, § 2, Fla. Const., it does not separately recognize sexual orientation as a protected class, and thus we do not rely on our state’s Equal Protection Clause to apply a heightened scrutiny examination to statutes discriminating on the basis of sexual orientation. See Fla. Dep’t of Children & Families v. Adoption of X.X.G., 45 So.3d 79, 81, 83 (Fla. 3d DCA 2010) (applying rational basis review to a statute prohibiting homosexuals from adopting).
Accordingly, we apply a rational basis analysis to our review of this claim. The specific question we confront is whether the classification between heterosexual and same-sex couples drawn by the assisted reproductive technology statute bears some rational relationship to a legitimate state purpose.
D.M.T. argues that defining the term “commissioning couple” in section 742.13(2), as applied in section 742.14, to include only one male and one female is related to the State’s legitimate interest in not extending rights to same-sex couples. Specifically, she cites to Florida law that declines to recognize same-sex marriages and prohibits homosexuals from adopting children. We reject this argument as unavailing for several reasons.
First, section 742.14 does not operate to grant parental rights to biological parents, but only to provide for the relinquishment of those rights in the case of the typical egg or sperm donor. In other words, section 742.14 allows a member of a “commissioning couple” to preserve his or her interest in the child conceived through assisted reproductive technology; however, that individual becomes a parent only if he or she has some legal basis to be recognized as a parent. This could be due to a biological connection plus the assumption of parental responsibilities, as we have demonstrated applies in this case, or through application of another statute. See, e.g., § 63.032(12), Fla. Stat. (2008) (defining the term “parent” to mean “a woman who gives birth to a child or a man whose consent to the adoption of the child would be required”); § 742.11, Fla. Stat. (2008) (defining the parental status of birth mothers and non-genetic, legal fathers). That is, sections 742.13 and 742.14 do not create a statutory basis for an individual who would not otherwise have parental rights to claim those rights. Therefore, because section 742.14 does not operate to grant rights, but only to eliminate rights that are already held or that may develop, any State interest that could potentially exist in not extending rights to same-sex couples is not implicated.
Second, there is no indication that the exception provided in section 742.14 for a “commissioning couple” extends only to married couples, so the state constitutional provision against same-sex marriage is also not implicated. See art. I, § 27, Fla. Const, (defining marriage as “the legal union of only one man and one woman as husband and wife” and stating that “no other legal union that is treated as marriage or the substantial equivalent thereof shall be valid or recognized”). By contrast, in the next statutory provisions, sections 742.15-16, Florida Statutes, which relate to gestational surrogacy, the Legislature has specifically provided that the “commissioning couple” must be “legally married” in order to claim protection under the statutes. See § 742.15(1), Fla. *343 Stat. (2008). In the assisted reproductive technology statute, however, the Legislature did not include an additional marriage requirement regarding an exemption from the relinquishment of parental rights with respect to the donation of eggs, sperm, or preembryos.
Third, we reject D.M.T.’s contention that recognizing T.M.H.’s parental rights in this case would undermine the State interest in providing certainty to couples using assisted reproductive technology to become parents because it would increase litigation regarding the intentions of individuals providing genetic material for use in assisted reproductive technology. No one disputes that the State has an interest in ensuring that the parental rights of children conceived through the use of assisted reproductive technology are defined by law, in making sure children have parents to care for them, and in preventing litigation that disrupts families. See, e.g., Santosky, 455 U.S. at 766, 102 S.Ct. 1388 (“Two state interests are at stake in parental rights termination proceedings — a parens patriae interest in preserving and promoting the welfare of the child and a fiscal and administrative interest in reducing the cost and burden of such proceedings.”).
In reality, however, the issue of an unmarried mother and father’s intent under the statute, including whether they qualify as a “commissioning couple,” has been the subject of prior litigation in the courts of this state. See Janssen v. Alicea, 30 So.3d 680, 681 (Fla. 3d DCA 2010) (reversing the trial court’s grant of summary judgment because a material fact existed as to whether the father of the child, who was a “close friend” of the mother, was simply a sperm donor or whether the mother and father were a “commissioning couple” who intended to jointly parent the child conceived through assisted reproductive technology); Lamaritata, 823 So.2d at 319 (rejecting a sperm donor’s claim to parental rights because the mother and father “did not commission or contract to jointly raise the children as mother and father” but instead “joined forces solely for the purpose of artificially inseminating” the mother); L.A.L. v. D.A.L., 714 So.2d 595, 596-97 (Fla. 2d DCA 1998) (granting a petition for writ of certiorari and directing the trial court to determine the applicability of section 742.14 where the mother and father had entered into an agreement regarding the use of assisted reproductive technology)-
Since intent, pursuant to the definition of “commissioning couple” found in section 742.13(2) and used in section 742.14, is the determinative element regarding whether two individuals seeking the assistance of reproductive technology to conceive qualify as a “commissioning couple,” it is of course relevant to the inquiry. We conclude, though, that the State does not have a legitimate interest in precluding same-sex couples from being given the same opportunity as heterosexual couples to demonstrate that intent. Consistent with equal protection, a same-sex couple must be afforded the equivalent chance as a heterosexual couple to establish their intentions in using assisted reproductive technology to conceive a child.
Finally, we note that the Third District has held Florida law prohibiting same-sex couples from adopting as unconstitutional. See Adoption of X.X.G., 45 So.3d at 92. In finding the legislative prohibition against a homosexual adopting a child to be unconstitutional as a denial of equal protection lacking a rational basis, the Third District in Adoption of X.X.G. noted that the parties in that case agreed “that gay people and heterosexuals make equally good parents,” and that no party offered a justification for the prohibition on homosexual adoption based “on any theory that homo *344 sexual persons are unfit to be parents.” Id. at 85.
Likewise, in this ease, no party and no amicus curiae has advanced the argument that either T.M.H. or, for that matter, D.M.T., is unfit to be a parent. Further, no party or amicus cui’iae has advanced the argument that the child’s best interests would be better served by having only one loving parent rather than two.[8] To the contrary, the very statute that bars T.M.H. from being considered part of a “commissioning couple” fully contemplates that D.M.T., as the birth mother, would be recognized as the mother of the child born from the couple’s use of assisted reproductive technology, even though D.M.T. has no genetic connection to the child.
We conclude that the State would be hard pressed to find a reason why a child would not be better off having two loving parents in her life, regardless of whether those parents are of the same sex, than she would by having only one parent.[9] This, once again, is particularly true given that in this statute the Legislature did not limit the definition of “commissioning couple” to married individuals. Thus, as we have observed, an unmarried heterosexual couple would have the same rights to parent the resulting child, under this statute, as a married couple. Critically, the only excluded category is for individuals of the same sex.
We further conclude that this distinction is unconstitutional as applied because it lacks a rational basis. Regardless of whether the individual’s parental rights have developed into a fundamental right, as T.M.H.’s have, the distinction is unconstitutional as applied to same-sex couples because the statute does not permit same-sex couples — and only same-sex couples— to qualify as a “commissioning couple.” Accordingly, based on the reasons we have set forth, we conclude that section 742.14, in conjunction with the restrictive definition of “commissioning couple” in section 742.13(2), violates the Equal Protection Clauses of the Florida and United States Constitutions as applied in this case because it prohibited T.M.H., as part of a same-sex couple, from qualifying as a “commissioning couple.”
III. Waiver of Rights
Lastly, we address the birth mother’s contention that, regardless of the *345 application of section 742.14 in this case, the biological mother waived any parental rights to this child by signing a standard informed consent form during the couple’s process of seeking medical assistance to conceive. The undisputed facts of this case clearly refute this argument and demonstrate that the biological mother did not expressly waive her parental rights. Instead, it is clear that the very purpose of the biological mother’s provision of the egg to her partner was to enable each party to become parents of the child they wished to conceive. This conclusion is supported by several facts, including a careful review of the informed consent form this Court has in its record, as well as the affidavit of the doctor who operated the reproductive center the couple attended.
While it is uncontroverted that the biological mother signed a standard “Informed Consent Oocyte Recipient” form for the Fertility and Reproductive Medicine Center for Women with the birth mother listed as the recipient, the biological mother signed this form as the birth mother’s partner and not as the individual providing the egg for the couple. Clearly, then, this informed consent does not on its face apply to waive the biological mother’s rights to the child, even though this is the document that the birth mother relied on in her initial motion to dismiss and motion for judgment on the pleadings.
The Fifth District addressed and rejected the birth mother’s argument that the biological mother had waived her parental rights, although the district court referenced a different preprinted form, an exact copy of which is not in this Court’s record. See T.M.H., 79 So.3d at 801. If there is another preprinted form, this form does not appear in our record, and the birth mother, as the appellant, bears the burden of producing a complete record on appeal. Significantly, the birth mother does not base her argument in this Court on the existence of this specific form and neither cites to nor quotes from this form in her brief.
In fact, the birth mother does not clearly identify the document the biological mother signed, discuss the circumstances under which this particular form was signed, or explain why the Fifth District, which specifically found this form to be inapplicable to the facts of this case, erred in concluding that the informed consent form did not waive the biological mother’s rights. Moreover, in asserting that the biological mother expressly waived her parental rights, the dissent relies on this form, an exact copy of which we do not have in the record, and on the “Informed Consent Oo-cyte Recipient” form, which the biological mother signed as the birth mother’s partner and not as the egg donor — neither of which can even remotely be considered conclusive.
In any event, courts that have considered similar standard informed consents used in reproductive technology have held that waiver provisions like the one referenced by the Fifth District are inapplicable in circumstances like those in this case. This is because it is uncontested that the biological mother was not an anonymous donor, but rather, that the parties were in a committed relationship where reproductive technology was used — with one woman providing her egg and the other partner bearing the child — so that both women became the child’s parents. See Matter of Sebastian, 25 Misc.3d 567, 879 N.Y.S.2d 677, 689 n. 44 (N.Y.Sur.2009) (holding that a standard egg donor waiver signed at the reproductive clinic did not apply where the biological mother had a relationship with the birth mother and only signed the waiver because there was no other way to accomplish the assisted reproductive technology procedure); K.M. v. E.G., 37 *346 Cal.4th 130, 33 Cal.Rptr.3d 61, 117 P.3d 673, 682 (2005) (holding that an almost identical informed consent form did not waive the biological mother’s rights because a “woman who supplies ova to be used to impregnate her lesbian partner, with the understanding that the resulting child will be raised in their joint home, cannot waive her responsibility to support that child. Nor can such a purported waiver effectively cause that woman to relinquish her parental rights.”).
We reject the dissent’s reliance on Lamaritata, 823 So.2d 316, to argue that the biological mother waived her parental rights. Lamaritata is completely distinguishable from this case. As the dissent acknowledges, the parties in Lamaritata specifically entered into a contract whereby they agreed that the donor would have no parental rights and obligations associated with any child conceived from the use of assisted reproductive technology. Id. at 318. This contract and the parties’ intentions in entering into it were never in dispute. See L.A.L., 714 So.2d at 596-97 (setting forth the specific language of the parties’ agreement in a prior decision involving the same parties). As the Second District explained, there were “no facts to show that [the parties] ha[d] any type of relationship that would fall under the rubric of ‘couple.’ Further, they did not commission or contract to jointly raise the children as mother and father.” Lamaritata, 823 So.2d at 319. Instead, according to the Second District, the parties in La-maritata “joined forces solely for the purpose of artificially inseminating Ms. La-maritata, an intent clearly set forth in the parties’ contract.” Id.
Despite the dissent’s view to the contrary, the facts of this case clearly demonstrate that exactly the opposite of the facts in Lamaritata are true here. Not only did the biological mother assume parental obligations, but the couple’s actions before and after the child’s birth — including their use of funds from their joint bank account, their statements to the reproductive doctor that they intended to raise the child as a couple, the counseling they underwent to prepare themselves for parenthood, the use of a hyphenated last name for the child, and the joint birth announcement— reveal that the couple’s agreement in actuality was to both parent the child they intended to conceive. Further, there was no issue as to the validity of the contract entered into by the parties in Lamaritata, whereas the whole point in this case is that the couple never intended for the biological mother to give up parental rights by signing a standard informed consent form in the reproductive doctor’s office.
We also reject the dissent’s reliance on Wakeman v. Dixon, 921 So.2d 669 (Fla. 1st DCA 2006). Like the Fifth District, we conclude that Wakeman “is clearly distinguishable from the instant case because there, one lesbian partner was the birth mother and the partner claiming parental rights was not the biological mother.” T.M.H., 79 So.3d at 794 n. 6. As the Fifth District correctly observed, the First District in Wakeman held that the individual seeking parental rights was neither a “biological” nor a “natural” parent, whereas in this case, T.M.H. “would fall into both categories under the Wakeman rationale.” T.M.H., 79 So.3d at 794 n. 6. Further, Wakeman specifically relied on cases involving nonparents, see Wakeman, 921 So.2d at 671 (citing Beagle, 678 So.2d 1271), which we have explained are inapplicable in this case.
Finally, in addition to the uncontrovert-ed fact that both women in this relationship were intending to, and did, jointly raise the child as their own from the time of birth until their acrimonious separation, it is clear from the affidavit submitted by *347 the doctor who operated the reproductive center the couple attended that any waiver of rights language in the standard forms signed as part of the couple’s process of using assisted reproductive technology would be inapplicable to this situation. The Fifth District described the doctor’s affidavit as follows:
[The biological mother] submitted at the summary judgment hearing an affidavit from the doctor who operated the reproductive center that [the parties] attended and who had personal knowledge of the services provided to both women. The testimony of the doctor reveals that the waiver provisions were simply part of a standard form he has all patients sign and that those provisions were inapplicable to [the parties]. In the affidavit, the doctor stated that the two women presented themselves as a couple seeking reproductive therapy, represented that they intended to raise a child together, and acted consistently with their desire to raise a child together. He further explained that the sole purpose of the form was to “inform [the biological mother] of the procedures that would be undertaken, the goals of the procedures and the risks related thereto, ” and that the form was not tailored to characterize the relationship of either [party] beyond that purpose. Finally, the doctor explained that the [waiver language] “is used in situations where the donor is anonymous.”
T.M.H., 79 So.3d at 801-02 (emphasis added).
Accordingly, the informed consent form signed by the biological mother has nothing to do with a release of parental rights where she was not an anonymous donor, but rather, was a full-fledged partner in the conception and raising of the child.
CONCLUSION
For the foregoing reasons, we hold that application of section 742.14 as a bar to T.M.H.’s assertion of parental rights is unconstitutional. The due process guarantees in the Florida and United States Constitutions and the privacy provision of the Florida Constitution do not permit the State to deprive this biological mother of parental rights where she was an intended parent and actually established a parental relationship with the child. We further hold that sections 742.18(2) and 742.14, in providing an exception to the statutory relinquishment of parental rights for egg and sperm donors who are part of a heterosexual “commissioning couple,” but not those who are part of a same-sex couple, violate the Florida and federal Equal Protection Clauses. We therefore hold that T.M.H.’s parental rights have not been terminated by law.
Accordingly, we affirm the Fifth District’s determination of statutory unconstitutionality, answer the certified question in the affirmative, and determine that T.M.H. has a constitutionally protected interest to parent the child under the United States Constitution and separately under the Florida Constitution. However, we disapprove the Fifth District’s decision to the extent that the district court alternatively determined that the statute did not apply because the definition of “donor” in section 742.14 allows for an inquiry of subjective intent. Consistent with this opinion, we direct that this case be remanded to the trial court to determine, based on the best interests of the child, issues such as parental time-sharing and child support.
It is so ordered.
QUINCE, LABARGA, and PERRY, JJ., concur.
*348 POLSTON, C.J., dissents with an opinion in which LEWIS and CANADY, JJ., concur.

. The question certified by the Fifth District as one of great public importance was as follows:
DOES APPLICATION OF SECTION 742.14 TO DEPRIVE PARENTAL RIGHTS TO A LESBIAN WOMAN WHO PROVIDED HER OVA TO HER LESBIAN PARTNER SO BOTH WOMEN COULD HAVE A CHILD TO RAISE TOGETHER AS EQUAL PARENTAL PARTNERS AND WHO DID PARENT THE CHILD FOR SEVERAL YEARS *328 AFTER ITS BIRTH RENDER THE STATUTE UNCONSTITUTIONAL UNDER THE EQUAL PROTECTION AND PRIVACY CLAUSES OF THE FEDERAL AND STATE CONSTITUTIONS?
T.M.H., 79 So.3d at 803.

. The dissent criticizes our use of the term "biological mother,” contending that the term is confusing because it ignores the birth mother’s biological relation to the child. We use the term "biological mother,” which was used by the Fifth District majority, because the term serves to distinguish the undeniable facts of this case from one where an individual provides genetic material for use in assisted reproductive technology without any intention of parenting the child.

. Although the dissent asserts that the constitutional claims were not preserved by T.M.H., we agree with the Fifth District majority that the constitutional claims were raised in the trial court, and certainly, by being raised and the focus of the Fifth District's opinion, the constitutional claims are properly before this Court for review.

. Both the Fifth District majority opinion, authored by Judge Sawaya and joined by Judge Monaco, and Judge Monaco's concurring opinion, in which Judge Sawaya also concurred, adopted this approach. Since both opinions had a majority, the views expressed in each represent the holdings of the Fifth District in this case.

. These statutory provisions have remained unchanged since first adopted in 1993.

. Although the dissent raises the spectre of unintended results of our decision by listing a series of different scenarios, see dissenting op. at 356, we have confidence that courts can, will, and must adjust to the "ever-continuing development of artificial reproductive technologies” and judge each case based on the specific factual situation presented. In re Roberto d.B., 399 Md. 267, 923 A.2d 115, 117 (2007). As the American Academy of Assisted Reproductive Technology Attorneys has pointed out in an amicus curiae brief filed on behalf of T.M.H. in this case, the number of children born through assisted reproductive technology "has increased dramatically” over the past few decades. Technological ad-vanees in science and medicine "that permit in vitro fertilization and egg harvesting ... help intended parents who are otherwise unable to have children of their own create a family” and are used by "opposite-sex married couples ..., same-sex couples, unmarried heterosexual couples, and single individuals who seek the opportunity to become parents.” Undoubtedly, the "law is being tested as ... new techniques [of assisted reproduction] become more commonplace and accepted,” In re Roberto d.B., 923 A.2d at 117, but courts must ensure that the constitutional rights of those individuals who intended to be parents to the child are protected.

. The opposite argument has in fact been advanced by the amici for the University of Florida Levin College of Law Center on Children and Families, University of Miami School of Law Children and Youth Law Clinic, Nova Southeastern University Law Center Children and Families Clinic, and Barry University School of Law Children and Families Clinic, as well as the National Association of Social Workers and National Association of Social Workers, Florida Chapter. These ami-ci have observed that peer-reviewed social science research demonstrates the developmental and psychological importance for children in maintaining a relationship with both of their parents when those parents become separated. See, e.g., Joseph S. Jackson & Lauren G. Fasig, The Parentless Child’s Right to a Permanent Family, 46 Wake Forest L.Rev. 1, 27-28 (2011); James G. Byrne, et al., The Contribution of Attachment Theoty to Child Custody Assessments, 46 J. of Child Psy-chol. & Psychiatry 115, 118 (2005); Frank J. Dyer, Termination of Parental Rights in Light of Attachment Theoty, 10 Psychol. Pub. Pol’y & L. 5, 11 (2004); see also Nat'l Scientific Council on the Developing Child Working Paper 1, Young Children Develop in an Environment of Relationships 1-2 (2004); Am. Acad, of Pediatrics: Committee on Early Childhood, Adoption, & Dependent Care, Developmental Issues for Young Children in Foster Care, 106 Pediatrics 1145, 1146 (2000).

. There is no dispute that the sperm donor in this case has relinquished any interest he has in the child. The statute clearly applies to him. Therefore, if T.M.H. is denied parental rights, this child will have only one legal parent.