IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FIFTH DISTRICT

NOT FINAL UNTIL TIME EXPIRES TO FILE MOTION FOR REHEARING AND DISPOSITION THEREOF IF FILED

JAMES ENRIQUEZ,

        Appellant,

v.

        Case No.  5D21-1542
        LT Case No. 2018-DR-14017

ASHLEY VELAZQUEZ,

        Appellee.
_____/

Opinion filed November 3, 2022

Appeal from the Circuit Court
for Orange County,
John D.W. Beamer, Judge.

William D. Palmer, Erin Pogue Newell,
and Shannon McLin, of Florida Appeals,
Orlando, for Appellant.

Chad A. Barr, of Chad Barr Law,
Altamonte Springs, and Jamie Billotte
Moses, of Holland & Knight LLP,
Orlando, for Appellee.

Matthew E. Thatcher, of The Solomon
Law Group, P.A., Tampa, Jennifer A.
Patti, of Brodie & Friedman, P.A., Boca
Raton, Christie Lou Mitchell, of The
CLM Law Firm, Orlando, Jennifer L.

Kipke, of Hesser &  Kipke,
Gainesville, Reuben A. Doupe
and  Sarah  M.  Oquendo,  of
Coleman,  Hazzard,  Taylor,
Klaus,  Doupe & Diaz, Naples,
and Raymond S.  Grimm,  of
Raymond  S.  Grimm,  Esq, P.A.,
North Port, Amicus Curiae for
Family Law Section of the Florida
Bar, on behalf of Appellant.

LAMBERT, C.J.

The parties, James Enriquez and Ashley Velazquez ("Mother"), both unmarried, decided to have a child together.  Though close friends, they were never in a romantic relationship with each other.  Instead, they successfully conceived a child using an at-home artificial insemination process.  The child is now seven years old.

Enriquez petitioned to establish paternity and to have timesharing with the minor child.  Mother answered, agreeing that Enriquez is the child's natural or biological father and further acknowledging that a parenting plan should be ordered by the trial court, with an appropriate timesharing schedule.  An interlocutory order was later entered in the case awarding Enriquez temporary timesharing with the child each week from Sunday morning through after school on Wednesday, with the trial court also noting in its order that "the parties stipulate to [Enriquez's] paternity [of the minor child]."

2

Approximately eighteen months after this order, trial was held on Enriquez's petition. The parties stipulated that the issues to be resolved by the court at trial were: (1) the amount of timesharing that each party would have with the child, (2) their resulting child support obligations, (3) which party's address would be used for purposes of a "school designation," and (4) who would claim the child as a tax exemption for federal income tax purposes.

Both parties testified at trial. In its final judgment, the trial court acknowledged that Mother had no objection to Enriquez having timesharing with the child, specifically finding, among other things, that Mother intended Enriquez to "be a constant figure in the child's life." The court found that since the interlocutory order awarding him temporary timesharing, Enriquez had, in fact, been a "constant presence in the child's life," with the child knowing him as "Dad."

The court also found that "[b]y all accounts, the statutory factors under section 61.13(3), Florida Statutes related to developing a parenting plan and time-sharing schedule, for the most part, favor both parties equally." In that regard, the court stated that the parties: (1) appeared to put the child's interests ahead of their own, (2) were flexible regarding their exercising of timesharing with the child so far, and (3) were informed as to the child's

3

education, interests, and medical needs. The court summed up that "both parties love and care for the child deeply and have been able to set most of their differences, which are few, aside for the child's best interests."

Despite these favorable findings, Enriquez received no timesharing with the child in the final judgment. Instead, on an issue never raised by Mother, the court, on its own initiative, concluded that section 742.14, Florida Statutes (2020), which it referred to as Florida's "assisted reproductive technology" statute, precluded it from granting Enriquez relief; and it "denied and dismissed" his petition for paternity with prejudice. Following the summary denial of Enriquez's motion for rehearing, this timely appeal ensued.

Enriquez raises three arguments here for reversal. He first contends that he was denied procedural due process when, following the parties' presentation of evidence and just prior to closing argument, the trial court raised the issue of whether section 742.14 precluded his claim of paternity. Enriquez argues that due to this sua sponte action of the trial court, he was unable to adequately prepare for and respond to what became the dispositive issue in the case. Second, Enriquez asserts that, based on the undisputed facts in this case, the trial court erred in applying section 742.14

4

to deny his petition. Third, Enriquez alternatively argues that section 742.14 is unconstitutional "as applied."

For the following reasons, we agree with Enriquez that the trial court committed reversible error in essentially ruling, as a matter of law, that section 742.14 applies to the facts of this case to bar his claim of paternity.[1]

ANALYSIS—

This appeal presents a question of law and statutory construction. Our review is de novo. *See Townsend v. R.J. Reynolds Tobacco Co.*, 192 So. 3d 1223, 1225 (Fla. 2016) (citing *Daniels v. Fla. Dep't of Health*, 898 So. 2d 61, 64 (Fla. 2005)). To begin this review, we first look to the language of the statute, which, since its inception, has substantively read:

> The donor of any egg, sperm, or preembryo, other than the commissioning couple or a father who has executed a preplanned adoption agreement under s. 63.213, shall relinquish all maternal or paternal rights and obligations with respect to the donation or the resulting children. Only reasonable compensation directly related to the donation of eggs, sperm, and preembryos shall be permitted.

§ 742.14, Fla. Stat.

---

[1] Based on our resolution of the case on this issue, we find it unnecessary to reach Enriquez's other arguments.

By this statute, "the Legislature articulated a policy of treating all individuals who provide eggs, sperm, or preembryos as part of assisted reproductive technology as 'donor[s]' bound by the terms of the statute, and then exempting two specific groups in accordance with the purpose behind the statutory enactment." *D.M.T. v. T.M.H.*, 129 So. 3d 320, 333 (Fla. 2013).

Addressing Enriquez's paternity action, the trial court analyzed whether Enriquez fell within either of the two recognized groups exempt from section 742.14's directive that a sperm donor otherwise relinquishes all paternal rights to a child born from their donation. It first observed, correctly, that Enriquez had not executed a preplanned adoption agreement under section 63.213, Florida Statutes; thus, he was not within that exempt group.

The court then turned to whether Enriquez and Mother were a "commissioning couple" who had used "assisted reproductive technology" in the conception of the child. The court acknowledged that a "commissioning couple" was defined in section 742.13(2), Florida Statutes (2020), as the "intended mother and father of a child who will be conceived by means of *assisted reproductive technology* using the eggs or sperm of at least one of the intended parents." (Emphasis supplied by the trial court). It then related the definition of "assisted reproductive technology," which provides, in full:

> "Assisted reproductive technology" means those procreative procedures which involve the laboratory

6

> handling of human eggs or preembryos, including, but not limited to, in vitro fertilization embryo transfer, gamete intrafallopian transfer, pronuclear stage transfer, tubal embryo transfer, and zygote intrafallopian transfer.

*See* § 742.13(1), Fla. Stat.

Applying these statutory definitions from section 742.13, which the trial court acknowledged under *D.M.T.* are to be read *in pari materia* with section 742.14,[2] the court, quite correctly, reached what it referred to as a "legal conclusion" that the parties' "at-home, do-it-yourself method of artificial insemination" did not involve the "laboratory handling of human eggs or preembryos."

At this point, the trial court had seemingly reasoned that because there was no laboratory handling of human eggs or preembryos, the child was not born through the use of "assisted reproductive technology," as that term is defined in section 742.13(1). However, it then concluded that this "does not change the fact that [Enriquez] is a sperm donor under section 742.14" and, as such, "[Enriquez] does not have parental rights to a child resulting from that donation."[3]

---

[2] *See D.M.T.*, 129 So. 3d at 333 (recognizing that the court "necessarily must read sections 742.13 and 742.14 together").

[3] The trial court did not expressly find that Enriquez and Mother were not a commissioning couple. By inference, it necessarily concluded they

We disagree with the trial court's ultimate conclusion. For the following reasons, we hold that section 742.14 applies to paternity actions only when the child was born as a result of assisted reproductive technology, which did not occur here.

Our dissenting colleague characterizes as misguided our conclusion that section 742.14 applies only when "assisted reproductive technology" is used, as that term is defined in section 742.13(1), asserting that we have improperly considered the Legislature's intent rather than just applying "the plain language of the statutory text." However, as also observed by the dissent, the Florida Supreme Court in *D.M.T.* considered the Legislature's intent in enacting section 742.14, and it likewise concluded that the Legislature intended that the statute apply only when assisted reproductive technology is used.

In that case, the supreme court referred to section 742.14 as the "assisted reproductive technology statute" eleven times[4]; and, as quoted

_____

were not, since a commissioning couple under the statute must conceive through assisted reproductive technology, which the court correctly found had not occurred. Moreover, it denied Enriquez's petition for paternity when he is unquestionably the child's biological father.

[4] The dissent suggests that the Florida Supreme Court's reference to section 742.14 as the "assisted reproductive technology statute" was based on the title of the legislative enactment creating the statute (i.e., the "bill title"). However, *D.M.T.* does not cite or mention at all the legislative enactment,

8

*supra*, the supreme court explicitly held that in enacting section 742.14, "the Legislature articulated a policy of treating all individuals who provide eggs, sperm, or preembryos *as part of assisted reproductive technology* as 'donor[s]' bound by the terms of the statute." *D.M.T.*, 129 So. 3d at 333 (emphasis added). Even the dissenting opinion in *D.M.T.*, written by then-Chief Justice Polston, referred to section 742.14 as the "assisted reproductive technology statute" three times; and it concluded that "[t]he purpose of this statute is to define the rights of parties *who use assisted reproductive technology to conceive* and to thereby provide certainty and stability for parents and children." *D.M.T.*, 129 So. 3d at 353 (Polston, C.J., dissenting) (emphasis added).

In the instant case, though the dissent arguably questions the practice of discerning legislative intent as a guiding principle in the interpretation of statutes, we are not permitted to disregard binding precedent from the Florida Supreme Court. We note, here, that we respectfully disagree with the dissent's assertion that the subject holding from *D.M.T.* constitutes obiter dicta. The first issue that was presented to the supreme court in *D.M.T.* and that the court addressed in its opinion was whether the party in that case

___

chapter 93-237, Laws of Florida; nor does it indicate in any other way that the supreme court considered the bill title in interpreting section 742.14.

9

from whom the eggs were withdrawn, and then fertilized and implanted into her partner via in vitro fertilization, was a "donor" pursuant to section 742.14. In the course of concluding that the party was a "donor" as that term is used in the statute, the supreme court held that with the exception of members of a "commissioning couple" or fathers who executed a preplanned adoption agreement, "the subjective intentions of all other individuals who provide eggs, sperm, or preembryos *during the course of assisted reproductive technology*" are not taken into consideration and that, "[i]nstead, the Legislature articulated a policy of treating all individuals who provide eggs, sperm, or preembryos *as part of assisted reproductive technology* as 'donor[s]' bound by the terms of the statute." *D.M.T.*, 129 So. 3d at 333 (second alteration in original) (emphases added). Those holdings were not obiter dicta because they consisted of "propositions along the chosen decisional path or paths of reasoning that (1) [were] actually decided, (2) [were] based upon the facts of the case, and (3) [led] to the judgment." *See Pedroza v. State*, 291 So. 3d 541, 547 (Fla. 2020). Nevertheless, even if we were not bound by the supreme court's holding in *D.M.T.*, we would reach the same result.

Examining the more recent Florida Supreme Court opinions highlighted by the dissent, in which the court focused solely on the

10

"supremacy-of-text principle"—i.e., that "[t]he words of a governing text are of paramount concern, and what they convey, in their context, is what the text means"—and in which the court did not endeavor to discern the Legislature's intent, the supreme court has nevertheless recognized that the "supremacy-of-text principle" requires consideration of the words of a statute "in their context" and that "every word employed in [a legal text] is to be expounded in its plain, obvious, and common sense, *unless the context furnishes some ground to control, qualify, or enlarge it*." *Ham v. Portfolio Recovery Assocs., LLC*, 308 So. 3d 942, 946–47 (Fla. 2020) (alterations in original) (emphasis added) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 56 (2012); *Advisory Op. to Governor re Implementation of Amend. 4, the Voting Restoration Amend.*, 288 So. 3d 1070, 1078 (Fla. 2020)).

Furthermore, even where the supreme court has recently held that inquiry into the Legislature's intent is "a secondary analysis to be employed when construing an ambiguous statute" and that "there is no occasion for resorting to the [secondary] rules of statutory interpretation and construction" where "the language of the statute is clear and unambiguous and conveys a clear and definite meaning," the supreme court has also recognized that related statutes must be read *in pari materia* "in order to determine whether

11

[they] create[] an ambiguity not otherwise apparent on the face" of the statute at issue. *State v. Peraza*, 259 So. 3d 728, 732–33 & n.2 (Fla. 2018) (first alteration in original) (first citing *Lowry v. Parole & Prob. Comm'n*, 473 So. 2d 1248, 1249 (Fla. 1985); then quoting *Holly v. Auld*, 450 So. 2d 217, 219 (Fla. 1984)). "This is true because '[w]here possible, courts must give effect to *all* statutory provisions and construe related statutory provisions in harmony with one another.'" *Id.* at 732 (alteration in original) (quoting *M.W. v. Davis*, 756 So. 2d 90, 101 (Fla. 2000)).

In the instant case, the dissent asserts that by section 742.14's "plain terms," it applies to "'any' donor" who does not satisfy one of the two exceptions explicitly provided in the statute, neither of which applies in the instant case. The dissent then asserts that because Enriquez "cannot dispute any factual issues related to whether he is a donor[,] . . . our review is limited to the legal issue of whether donors who use at-home methods of artificial insemination relinquish parental rights under section 742.14." By so framing the issue, the dissent begins with the assumption that Enriquez is a "donor" in analyzing the question of whether Enriquez is a "donor."

In the underlying proceedings, there was no dispute that Enriquez's sperm was used to impregnate Mother via the at-home, do-it-yourself artificial insemination procedure utilized by the parties to conceive a child.

12

That issue of fact remains undisputed. The question of whether the use of Enriquez's sperm in that manner supports the conclusion that Enriquez is a "donor" as that term is used in section 742.14 constitutes a question of statutory interpretation and application that is an issue of law. *See, e.g.*, *McGovern v. Clark*, 298 So. 3d 1244, 1248 (Fla. 5th DCA 2020) (citing *B.Y. v. Dep't of Child. & Fams.*, 887 So. 2d 1253, 1255 (Fla. 2004); *In re Guardianship of J.D.S.*, 864 So. 2d 534, 537 (Fla. 5th DCA 2004)).

As demonstrated, *infra*, if one were to follow the dissent's reasoning to its logical end, there would be no basis in the plain language of the statute to refrain from applying section 742.14 to the scenario of a child conceived through sexual intercourse; and the plain language of the statute could even support applying section 742.14 to the scenario of a child conceived through sexual intercourse without the conceiving parents having any predetermined intentions as to the parentage of the child, which would be inconsistent with the rest of chapter 742 controlling determinations of paternity.

The plain language from the text of section 742.14, without reference to context, provides that the donor of any sperm, except in the two previously discussed exceptions, relinquishes all paternal rights to the resulting children. However, had Enriquez and Mother gone into the bedroom on the day in question with the intent of conceiving a child and chose to procreate

13

through sexual intercourse instead of artificial insemination, would Enriquez still be a "donor" under the statute and thus precluded from paternal rights to the child?

"Donor" is not defined in section 742.14 or, for that matter, in chapter 742. The dictionary definition of the word "donor" is "one that gives, donates, or presents something" or "one used as a source of biological material (such as blood or an organ)." *Donor*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/donor (last visited Oct. 11, 2022). The first dictionary definition of "donor" could logically be applied to one who "gives" or "presents" sperm through sexual intercourse as much as it could be applied to one who does so through an at-home, do-it-yourself artificial insemination kit. That first definition of "donor" could be applied irrespective of whether either parent had any predetermined intention as to the parentage of any child potentially conceived by the sexual intercourse.

On the other hand, while the second dictionary definition might appear to better apply to the at-home artificial insemination scenario than to sexual intercourse, nothing could stop a mother of a child from challenging a paternity action filed by the child's biological father on the basis that she engaged in sexual intercourse with the father for the purpose of "using" him "as a source of biological material" (i.e., sperm) and that the father is

14

therefore a "sperm donor" who relinquished all parental rights under section 742.14, irrespective of whether the father had any knowledge of the mother's plot. The second dictionary definition of "donor" could also be asserted by the biological father of a child to avoid parental responsibility, based on the argument that the mother agreed that she was only using him as a source of biological material (i.e., as a "sperm donor"). In fact, such arguments have actually been raised, and properly rejected, in Florida courts. *See Bassett v. Saunders*, 835 So. 2d 1198, 1199 (Fla. 1st DCA 2002) (recognizing that the trial court correctly found that because the father impregnated the mother in the "usual and customary manner," the "sperm donor" "agreement was invalid and unenforceable under the sperm donor statute"); *Budnick v. Silverman*, 805 So. 2d 1112, 1114 (Fla. 4th DCA 2002) (rejecting a father's argument in a paternity action that he was merely a sperm donor under section 742.14 and finding that section 742.14 does not apply when, under the sperm donor agreement, the father impregnated the mother in the "old-fashioned way").

Because the plain language of section 742.14 leaves open the possibility of interpreting the word "donor" in a manner that would make section 742.14 mutually exclusive with sections 742.011–.108, Florida Statutes, relating to the determination of parentage for children born out of

15

wedlock, we interpret section 742.14 in a manner that "give[s] effect to *all* statutory provisions" and construe section 742.14 and the rest of chapter 742 "in harmony with one another."  *See Peraza*, 259 So. 3d at 732 (quoting *M.W.*, 756 So. 2d at 101); *see also* Scalia & Garner, *supra*, at 252–54 (asserting that under the "Related-Statutes Canon," laws dealing with the same subject should if possible be interpreted harmoniously because a single statute "should no more be interpreted to clash with the rest of [the body of law to which it belongs] than it should be interpreted to clash with other provisions of [that same statute]" and explaining that the "Related-Statutes Canon" is "based upon a realistic assessment of what the legislature ought to have meant," a basis that itself "rests on two sound principles: (1) that the body of the law should make sense, and (2) that it is the responsibility of the courts, within the permissible meanings of the text, to make it so"). Otherwise, could not the plain, untethered text of section 742.14 apply to a couple where the male donates his sperm through sexual intercourse and neither of the two exemptions contained within the statute applies?

Considering section 742.14 *in pari materia* with related statutes, we conclude that the term "donor" in section 742.14 refers to an individual who provides "any egg, sperm, or preembryo" as part of "assisted reproductive technology."  In fact, as stated *supra*, such an interpretation of "donor" in

16

section 742.14 is binding upon this court by means of the Florida Supreme Court's interpretation of that statute in *D.M.T.* *See* 129 So. 3d at 333 (holding that the term "donor" in section 742.14 applies to "all individuals who provide eggs, sperm, or preembryos as part of assisted reproductive technology").

In our view, had the Legislature intended to include the at-home artificial insemination process utilized in this case as one of the procreative procedures coming within the statutory definition of "assisted reproductive technology," it could have clearly and easily done so and may, in fact, elect to do so in the future, as is entirely within its prerogative. However, we hold today that section 742.14, Florida Statutes, does not bar Enriquez's claim for paternity of the minor child when the child was conceived by an at-home artificial insemination process as done in this case.

Accordingly, we reverse the final judgment denying and dismissing Enriquez's petition for paternity with prejudice. We remand with directions that the trial court immediately enter a final judgment granting Enriquez's petition and finding and establishing him as the legal father of the minor child. The trial court is further directed to adjudicate forthwith the issue of timesharing, together with the other issues that were stipulated to by the parties to be resolved at trial, taking into consideration any additional evidence that may be presented by either party so as to provide for the

17

current best interests of the child.[5]

REVERSED and REMANDED, with directions.

HARRIS, J., concurs.
SASSO, J., dissents, with opinion.

---

[5] We also decline our dissenting colleague's suggestion to certify our decision to be in conflict with *A.A.B. v. B.O.C.*, 112 So. 3d 761 (Fla. 2d DCA 2013). *A.A.B.*, which predates the Florida Supreme Court decision in *D.M.T.*, addressed the situation where a third person donated his sperm to two women in a committed relationship so that they could conceive a child, which are not the facts in the present case.

SASSO, J., dissenting.

The disposition of this case turns on the interpretation of section 742.14, which provides:

> The donor of any egg, sperm, or preembryo, other than the commissioning couple or a father who has executed a preplanned adoption agreement under s. 63.213, shall relinquish all maternal or paternal rights and obligations with respect to the donation or the resulting children.

§ 742.14, Fla. Stat. (2020). Under the majority's interpretation though, the statute reads a bit differently. The majority's interpretation transforms section 742.14 to read as follows, with additional language in bold:

> The donor **who provides as a part of assisted reproductive technology** any egg, sperm, or preembryo, other than the commissioning couple or a father who has executed a preplanned adoption agreement under s. 63.213, shall relinquish all maternal or paternal rights and obligations with respect to the donation or the resulting children.

The majority believes this conclusion is required by *D.M.T. v. T.M.H.*, 129 So. 3d 320 (Fla. 2013). I disagree. *D.M.T.* does not require the result reached by the majority nor does a proper interpretation of section 742.14 permit it. As a result, I respectfully dissent.

19

## I.

To begin, it is important to clarify the issue presented by this appeal. Appellant argues that he did not relinquish parental rights pursuant to section 742.14 because his donation was achieved via "artificial insemination at home without the use of 'assisted reproductive technology' as defined in section 742.13(1), Florida Statutes (2020)." He cannot dispute any factual issues related to whether he is a donor because he has not provided this Court with a transcript. *See Applegate v. Barnett Bank of Tallahassee*, 377 So. 2d 1150, 1152 (Fla. 1979) ("Without a record of the trial proceedings, the appellate court can not properly resolve the underlying factual issues so as to conclude that the trial court's judgment is not supported by the evidence or by an alternative theory."). As a result, our review is limited to the legal issue of whether donors who use at-home methods of artificial insemination relinquish parental rights under section 742.14.

The text of section 742.14 forecloses Appellant's argument. By its plain terms the statute applies to "any" donor, with two exceptions: 1) a "commissioning couple" or 2) a "father who has executed a preplanned adoption agreement under s. 63.213." It is undisputed that neither exception applies here. Appellant did not execute a preplanned adoption agreement,

and he does not fall within the definition of a "commissioning couple," as that term is defined in section 742.13(2), Florida Statutes (2020).

This is where our inquiry should end. Our "sole function" in interpreting statutes is to apply to the law as we find it. *Alachua Cnty. v. Watson*, 333 So. 3d 162, 169 (Fla. 2022) (citations omitted). This is our obligation even if we believe the proper interpretation leads to a harsh outcome. *See Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121, 134 (2015) (observing courts lack the authority to rewrite statutes).

## II.

Despite section 742.14's unambiguous reference to "any" donor, the majority, relying on *D.M.T.*, limits that section to donors who provide genetic material in laboratory settings. *D.M.T.* does not require that result.

In *D.M.T.*, the Florida Supreme Court was presented with two issues: 1) whether section 742.14 applied to a woman who donated an egg to another woman with whom she was previously in a same-sex relationship with, even though her subjective intent was otherwise, and 2) if so, whether the statute was unconstitutional as applied to the egg donor. Critically though, the *D.M.T.* court did not conclude that section 742.14 applies *only* to individuals employing "assisted reproductive technology." And it certainly did not conclude that section 742.14 does not apply to sperm donors who

21

provide donations via at-home artificial insemination methods. Nor could it—those facts were not presented to the *D.M.T.* court.

Nonetheless, the majority seizes on the *D.M.T.* court's observations related to section 742.14's creation. Specifically, the *D.M.T.* court stated that in structuring section 742.14 as applying to all donors, with two exceptions, "the Legislature articulated a policy of treating all individuals who provide eggs, sperm, or preembryos as part of assisted reproductive technology as 'donor[s]' bound by the terms of the statute . . . ." *D.M.T.*, 129 So. 3d at 333. But this statement by the *D.M.T.* court is dicta, not a holding. *See Pedroza v. State*, 291 So. 3d 541, 547 (Fla. 2020) ("A holding consists of those propositions along the chosen decisional path or paths of reasoning that (1) are actually decided, (2) are based upon the facts of the case, and (3) lead to the judgment."). So, the statement is better read as an observation made by way of background; not as a means of determining whether the application of section 742.14 is limited to donations that occur in laboratory settings. Similarly, the *D.M.T.* court's multiple references to "the assisted reproductive technology statute" do not transform that choice of stylistic phrase into a holding regarding the statue's reach.

### III.

Notwithstanding *D.M.T.*, the majority says it would reach the same

22

result. But this Court should not. The *D.M.T.* court's frequent reference to the "assisted reproductive technology statute" appears to be a reference to the title of the legislative enactment (the "bill title") creating section 742.14. And even considering a bill title leads the court down a wayward path.

For background, a bill title is required by Article III, section VI of the Florida Constitution and appears above the bill's enacting clause. Importantly though, the bill title is not part of the enacted statute (in contrast to statutory titles and headings) and thus does not make its way into Florida Statutes. It is replicated in Florida Chapter Laws, but only as it appears in the bill that was enacted.

Here, the title of the bill that created section 742.14 begins with the phrase "AN ACT relating to reproductive technology." But this bill title, which is not part of the enacted statute, cannot be relied upon to vary the plain meaning of the statutory language the legislature did enact. *See, e.g.*, *Neumann v. City of New York*, 122 N.Y.S. 62, 66 (N.Y. App. Div. 1910) ("Neither the title of an act, nor a preamble contained in it, can control the plain words thereof, nor extend its purview to objects mentioned in either title or preamble but not in the act itself." (citing 2 Lewis' Sutherland, Statutory Constr. (2d ed.) §§ 339, 389)). The majority does this though, when it cabins section 742.14 to apply only to paternity cases involving disputes over

23

"assisted reproductive technology" even though the legislature itself did not so limit that section's application.

The majority then compounds the problem by deploying "intent"— rather than the plain language of the statutory text—as determinative of section 742.14's meaning. The practice of attempting to discern and then give effect to legislative intent is problematic for several reasons. At its foundation, attempting to discern legislative intent is "a search for the nonexistent." *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 394 (2012). "[C]ollective intent is pure fiction because dozens if not hundreds of legislators have their own subjective views on the minutiae of bills they are voting on—or perhaps no views at all because they are wholly unaware of the minutiae." *Id.* at 392.[1]

---

[1] Here, there are competing policy considerations that neither the *D.M.T.* court nor the majority have accounted for in determining the legislature's "intent." *See, e.g.*, Elizabeth Watkins, *Who's Your Daddy?: In Vitro-Fertilization and the Parental Rights of the Sperm Donor*, 30 U. Fla. J.L. & Pub. Pol'y 131, 139–40 (2019) (observing that the 1973 version of the Uniform Parentage Act, which provided that only sperm donors who provided the donation "to a licensed physician" relinquished parental rights, was amended to eliminate the "to a licensed physician" requirement, so that those who could not afford artificial insemination through a licensed physician could benefit from the statute's protections). So, even if it were possible to discern some collective intent, it is not clear whether the majority or the *D.M.T.* court properly guessed the legislature's intent in creating section 742.14. But again, these policy considerations, which I highlight only to underscore the problem with the majority's methodology, are for the legislature, not the judiciary.

More importantly though, we are required to interpret the statute according to its plain meaning—not the legislature's subjective intent. Indeed, "even the most formidable argument concerning the statute's purposes [can] not overcome the clarity [of] the statute's text." *Kloeckner v. Solis*, 568 U.S. 41, 55 n.4 (2012).

IV.

So, instead of focusing on intent we should, as the Florida Supreme Court has more recently stated, follow the "supremacy-of-text principle"— namely, the principle that "[t]he words of a governing text are of paramount concern, and what they convey, in their context, is what the text means." *Ham v. Portfolio Recovery Assocs., LLC*, 308 So. 3d 942, 946 (Fla. 2020) (quoting Scalia & Garner, *Reading Law* at 56).[2] And, as explained above, the plain language of the governing text forecloses the majority's interpretation.

---

[2] We do this because the legislature does not enact intent, it enacts text. *See Livingston Rebuild Ctr., Inc. v. R.R. Ret. Bd.*, 970 F.2d 295, 298 (7th Cir. 1992). Only the text of the statute—not the legislature's "intent"— went through bicameralism and presentment as required by Article III of the Florida Constitution. The statutory text, not the subjective intent of either one or many legislators, is the legitimate source of law. So, the words that were enacted, rather than some amorphous concept of intent, must be our guide in determining the statute's meaning.

25

The majority attempts to sidestep the clear implications of section 742.14 by concluding that the term "donor" must be viewed in context and limited to donors using "assisted reproductive technology," presumably as that term is defined by section 742.13. To be clear, I agree that context always matters in statutory interpretation. "Let us not forget, however, *why* context matters: It is a tool for understanding the terms of the law, not an excuse for rewriting them." *King v. Burwell*, 576 U.S. 473, 501 (2015) (Scalia, J., dissenting) (emphasis in original). And here, limiting the term "donor" as the majority does is not a product of reading the statutes *in pari materia*, but instead would result in judicial revision of section 742.14. *See, e.g.*, *State v. Bradford*, 787 So. 2d 811, 819 (Fla. 2001) ("[T]he concept of reading statutes *in pari materia* does not require that elements from one subsection be carried over and inserted into another subsection even if the statutes are related.").

Rather than offering support, further examination of the contextual clues presented by chapter 742 only undermines the majority's conclusion. As the trial court correctly observed, the legislature incorporated section 742.13(1)'s definition of "assisted reproductive technology" into section 742.14 only through the definition of "commissioning couple" in section 742.13(2). Reading section 742.14 and section 742.13 together provides the

26

meaning of commissioning couple. Specifically, a commissioning couple is a couple that employs assisted reproductive technology of the type that involves "laboratory handling" of human eggs or preembryos. § 742.13(1), (2), Fla. Stat. But the term "donor" is not so limited.

And if the term "donor" is so limited, the structure of section 742.14 starts to crumble. Applying the legislature's definition of "assisted reproductive technology" to the term "donor" in section 742.14 would replicate the defined phrase twice—once to limit the term "donor," and again to limit the term "commissioning couple." In addition, chapter 742's definition of "assisted reproductive technology" refers only to the laboratory handling of "human eggs or preembryos." So, under the majority's construction, if a sperm donation is provided in a laboratory setting, but there is no laboratory handling of the egg, section 742.14 would also not apply. Rather than provide harmony between the various sections of chapter 742, the majority's interpretation only creates discord.[3]

---

[3] The majority also seems somewhat motivated by the parade of horribles that will ensue if section 742.14 is interpreted to limit Appellant's parental rights. Rather than answer every question the majority poses, which present both facts and legal questions not presented by this case, I observe the following: section 742.10 provides for the establishment of paternity for children born out of wedlock, a procedure that was not employed in this case. Section 742.11 addresses the scenario in which a child conceived by means of artificial insemination is born within wedlock. And section 742.14 addresses the rights of donors. Each of these statutory sections maintains

27

Further, I agree with the majority that if the "Legislature intended to include the at-home artificial insemination process utilized in this case as one of the procreative procedures coming within the statutory definition of 'assisted reproductive technology,' it could have clearly and easily done so." Adding artificial insemination into section 742.13(1) though would only broaden the definition of a "commissioning couple," potentially bringing Appellant within its scope. The absence of that term, in my view, bolsters the determination that section 742.14 is meant to apply to "any" donor, including those who use at-home artificial insemination procedures. *See also T.M.H. v. D.M.T.*, 79 So. 3d 787, 812 (Fla. 5th DCA 2011) (Lawson, J. dissenting) (concluding the term "donor" in the context of section 742.14 "universally encompasses anyone who provides genetic material for use by another").

I am not the first to reach this conclusion. The Second District reached the same conclusion in *A.A.B. v. B.O.C.*, 112 So. 3d 761 (Fla. 2d DCA 2013),[4] when it held that section 742.14 "does not require that the artificial insemination be performed in a clinical setting to apply." *Id.* at 764. As a

---

its operative effect if section 742.14 is interpreted to apply to, as it says, "any" donor, rather than only donors who provide donations in laboratory settings.

[4] In my view the holding in *A.A.B.* expressly and directly conflicts with the majority opinion in this case. If I were in the majority, I would certify conflict.

28

result, the Second District concluded the trial court erred in granting the biological father parental rights with respect to a child who was conceived via artificial insemination, determining that the "do-it-yourself" manner in which the artificial insemination was conducted did not alter the fact that the biological father was a sperm donor for purposes of section 742.14. *Id.*

To summarize, the majority's problematic methodology leads to a result that the plain language of the text cannot bear. Further, no case cited by the majority requires the result it reached.[5] By contrast, the trial court faithfully applied the reasonable meaning of the statutory text and concluded that because Appellant, a donor, did not fall within one of the two legislatively supplied exceptions to those donors who relinquish parental rights, he relinquished all paternal rights. So, I would affirm on that basis.

V.

Finally, Appellant has not presented any other argument that constitutes reversible error. First, his due process argument does not provide

---

[5] *Bassett v. Saunders*, 835 So. 2d 1198 (Fla. 1st DCA 2002), does not analyze the question of whether section 742.14 applies to donors who provide donations in laboratory settings because that issue was not presented to the court. Additionally, *Budnick v. Silverman*, 805 So. 2d 1112 (Fla. 4th DCA 2002), is distinguishable because it concluded that section 742.14 does not apply to a conception that happened "the old-fashioned way," so it did not address the method employed here, an at-home artificial insemination process.

29

a basis for reversal. The matter of Appellant's paternity is a necessary element of proof to "an action to determine paternity," as Appellant's petition stated, and he was able to present full and competent argument regarding the issue. *See, e.g.*, *Gingola v. Fla. Dep't of HRS*, 634 So. 2d 1110, 1111 (Fla. 2d DCA 1994) ("The party seeking to establish paternity bears the burden of proof by clear and convincing evidence."); *G.F.C. v. S.G.*, 686 So. 2d 1382, 1385–86 (Fla. 5th DCA 1997) (holding that man who declared himself to be biological father of child born to intact marriage "failed to allege sufficient facts to assert a constitutionally based cause of action for paternity").

Second, the statute is not unconstitutional as applied to Appellant. Instead, Appellant relinquished his rights and claims to any resulting child at the time of his sperm donation by failing to execute a pre-planned adoption agreement. The plain language of section 742.14 provides that Appellant has no parental rights or obligations with respect to the child and, therefore, Appellant has failed to demonstrate that section 742.14 violates his rights under both the United States and Florida Constitutions. I would therefore affirm the final judgment in its totality. For that reason, I respectfully dissent.